## UNITED STATES *v.* LOUISIANA ET AL.

No. 9, Orig.  Argued March 18, 1980—Decided April 28, 1980

254

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, in which STEWART and REHNQUIST, JJ., joined, *post*, p. 273. MARSHALL, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Claiborne* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Bruce C. Rashkow, Michael W. Reed,* and *Margaret Strand.*

*William J. Guste, Jr.,* Attorney General of Louisiana, and *Frederick W. Ellis,* Special Assistant Attorney General, argued the cause for defendants. With them on the briefs were *Oliver P. Stockwell* and *Booth Kellough,* Special Assistant Attorneys General, *Gary L. Keyser* and *C. H. Mandell,* Assistant Attorneys General, and *Nora K. Duncan.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

We are concerned here with certain features of what appears to be the final stage of the long-continuing and sometimes strained controversy between the United States and the State of Louisiana over the proceeds of mineral leases on lands off

Louisiana's Gulf Coast. Specifically at issue are the asserted obligation of the United States for interest on, or for the value of the use of, impounded funds that have been awarded and paid to Louisiana, and the asserted obligation of Louisiana to account to the United States for certain unimpounded lease revenues received by the State.

I

Litigation between the United States and the State of Louisiana over rights in lands submerged in the Gulf of Mexico off the Louisiana coast began over 30 years ago, in 1948, when the United States moved this Court, under its original jurisdiction, for leave to file a complaint. The Government prayed for a decree (a) declaring rights of the United States as against Louisiana over lands "underlying the Gulf of Mexico, lying seaward of the ordinary low-water mark on the coast of Louisiana and outside of the inland waters, extending seaward twenty-seven marine miles and bounded on the east and west, respectively, by the eastern and western boundaries of the State of Louisiana," and (b) requiring that Louisiana account to the United States for money received by the State after June 23, 1947, from the area so designated. Over opposition, the requested leave was granted. *United States* v. *Louisiana*, 337 U. S. 902 (1949). Louisiana was directed to answer. 337 U. S. 928 (1949). The State, however, filed a demurrer and motions to dismiss and for other relief. These were overruled and denied. 338 U. S. 806 (1949).

Louisiana then did answer, placing in issue the claims of the United States and asserting affirmative defenses. The plaintiff's responsive motion for judgment was set down for argument. The Court ruled that *United States* v. *California*, 332 U. S. 19 (1947), then recently decided, controlled the Louisiana litigation. In that case, the Court had held that California was not the owner of the marginal belt along its coast beyond the low-water mark, and that the Federal Govern-

ment had primary rights in and power over that belt. The rationale, it was said, was that "[n]ational rights must therefore be paramount in that area." 339 U. S. 699, 704 (1950). A decree was entered enunciating the United States' possession of "paramount rights" and Louisiana's lack of "title thereto or property interest therein"; enjoining Louisiana from carrying on activities in the area for the purpose of taking petroleum, gas, or other mineral products without authority first obtained from the United States; and stating that the United States was entitled to an accounting from Louisiana of sums derived by the State from the area since June 5, 1950 (the date of the Court's opinion). 340 U. S. 899 (1950). A like decree was entered in a companion case against Texas. *United States* v. *Texas,* 340 U. S. 900 (1950).

The Submerged Lands Act, 67 Stat. 29, 43 U. S. C. § 1301 *et seq.,* passed May 22, 1953, came in response to these rulings. By that statute, the United States released to the coastal States its rights in the submerged lands within stated limits and confirmed its own rights therein seaward of those limits. The Act was sustained as a constitutional exercise of Congress' power to dispose of federal property. *Alabama* v. *Texas,* 347 U. S. 272 (1954).

The passage of the Act, however, did not end the controversy. Opposing claims continued to be asserted, and Louisiana continued to conduct leasing activities with respect to submerged lands in the disputed area. Accordingly, in 1956, the United States sought and was granted leave to file a complaint in a new suit (the present litigation) against Louisiana. 350 U. S. 990. The Court forthwith enjoined Louisiana and the United States "from leasing or beginning the drilling of new wells in the disputed tidelands area . . . unless by agreement of the parties filed here." 351 U. S. 978 (1956). In response to this ruling, on October 12, 1956, the parties entered into an Interim Agreement designed to permit further development of the submerged lands in dispute. Interpretation of this agreement is the central task of this

opinion. The lawsuit continued, and in 1957 the other Gulf States in effect were requested to intervene. 354 U. S. 515.

In due course this Court held, among other things, that the Submerged Lands Act granted Louisiana ownership "to a distance no greater than three geographical miles from its coastlines, wherever those lines may ultimately be shown to be." 363 U. S. 1, 79 (1960). A "Final Decree" was entered accordingly. 364 U. S. 502 (1960). That decree, like the one of 1950 in the earlier litigation, confirmed in the United States as against Louisiana all the land, minerals, and other natural resources underlying the Gulf of Mexico more than three geographic miles seaward from the coastline; recited that Louisiana had no interest therein and was enjoined from interfering with the rights of the United States; stated that as against the United States Louisiana was entitled to all the lands, minerals, and other natural resources underlying the Gulf extending seaward from its coastline three geographic miles, and that the United States was not entitled to any interest therein (with a stated exception inapplicable here); and provided that whenever the location of the coastline of Louisiana should be agreed upon or determined, the State was to render the United States an appropriate accounting of all sums derived by it since June 5, 1950, "either by sale, leasing, licensing, exploitation or otherwise from or on account of any of the lands or resources [decreed to the United States] . . . provided, however, that as to the State of Louisiana the allocation, withdrawal and payment of any funds now impounded under the Interim Agreement between the United States and the State of Louisiana, dated October 12, 1956, shall, subject to the terms hereof, be made in accordance with the appropriate provisions of said Agreement." *Id.*, at 503.

On December 13, 1965, a supplemental decree was entered. 382 U. S. 288. It generally reconfirmed the respective rights of the United States and Louisiana as theretofore determined; released to the United States all sums held impounded by it

under the Interim Agreement and attributable to the lands confirmed in the United States; released to Louisiana all sums held impounded by it under that agreement and attributable to the lands confirmed in the State; directed, within 75 days, the payments required of the respective parties, and an accounting from each of sums attributable to lands confirmed in the other, *id.*, at 293; and retained jurisdiction particularly with respect "to the remainder of the disputed area," *id.*, at 295.

The determination of the exact location of the Louisiana coastline remained for resolution. In *United States* v. *California*, 381 U. S. 139 (1965), this Court held that Congress had left to the courts the task of defining "inland waters," and the Court adopted for purposes of the Submerged Lands Act the definitions contained in the international Convention on the Territorial Sea and the Contiguous Zone, ratified by the United States in 1961. [1964] 15 U. S. T. (pt. 2) 1607, T. I. A. S. No. 5639. In the present litigation, in March 1969, the Court held that that part of Louisiana's coastline which, under the Submerged Lands Act, consists of "the line marking the seaward limit of inland waters," see 43 U. S. C. § 1301 (c), is also to be drawn in accordance with the definitions of the Convention. It decided to refer to a Special Master particularized disputes over the precise boundary between the submerged lands belonging to the United States and those belonging to Louisiana. 394 U. S. 11. A Master was appointed. 395 U. S. 901 (1969).

A second supplemental decree was entered December 20, 1971. 404 U. S. 388. That decree, among other things, determined that the United States had exclusive rights to an area of the Continental Shelf lying more than one foot seaward of a line therein described; recited that sums held impounded by the United States under the Interim Agreement and derived from those lands were released to the United States, *id.*, at 389; and provided that leases of lands lying partly within that area and partly landward thereof were not affected

by the decree, so that revenues derived therefrom were to remain subject to impoundment, *id.*, at 402.

Still a third supplemental decree was entered October 16, 1972. 409 U. S. 17. By this decree, the Court ruled that, with a stated exception, Louisiana was entitled to all lands, minerals, and other natural resources lying more than one foot landward of a line therein described and seaward of the ordinary low-water mark on the Louisiana shore, *id.*, at 17–18; that leases of land partly within that area and partly seaward thereof were not affected by the decree, so that revenues derived therefrom were to remain subject to impoundment; and that all sums held impounded by Louisiana or the United States under the Interim Agreement derived from leases of lands wholly within areas allotted to Louisiana were released to that State, *id.*, at 31.

The Special Master thereafter filed his report dated July 31, 1974. Exceptions to that report made by the United States and by Louisiana, respectively, were overruled, the Special Master's recommendations were accepted, and the parties were directed to prepare and file a proposed decree establishing "a baseline along the entire coast of the State of Louisiana." 420 U. S. 529, 530 (1975). The parties were able to agree, and a fourth supplemental decree was entered June 16, 1975. 422 U. S. 13. Exclusive rights were affirmed in the respective parties in areas lying landward or seaward of a line three geographical miles seaward of the baseline, and impounded sums were released accordingly. *Id.*, at 13–14. Cross-payments within 90 days and cross-accountings within 60 days were ordered. *Id.*, at 15. The decree recited: "It is understood that the parties may be unable to agree on . . . whether interest may be due on funds impounded pursuant to the Interim Agreement of October 12, 1956." *Id.*, at 17. The required accountings were filed and referred to the Special Master. 423 U. S. 909 (1975).

The Master held hearings on the accountings and on the objections that were interposed. He now has filed his supple-

mental report dated August 27, 1979. Louisiana and the United States have each filed exceptions to that report.

## II

As was observed at the beginning of this opinion, the parties and this Court should be near the end of this long-enduring litigation. The territorial dispute has been resolved. The boundary between federal and state submerged lands, except for the formal entry of yet another supplemental decree describing that boundary, has been fixed. And each party has been directed to account for revenues derived from areas adjudicated to the other sovereign.

The Special Master's supplemental report recites the filing of the several accountings by Louisiana and by the United States; the respective objections made to those accountings; the agreements reached by the parties; and the fact that three issues remain unresolved. As phrased by the Master, these issues are:

> First issue—Is the United States obligated to account for and pay to the State of Louisiana either the value of the use of Louisiana's share of the impounded funds or interest upon that portion of those funds?
>
> Second issue—Does Louisiana have the obligation to account for revenues received by it from mineral leases on areas lying within Zone 1?
>
> Third issue—Does Louisiana have the obligation to account for as unimpounded funds and to pay to the United States money collected by it as severance taxes on minerals removed from areas subsequently determined to belong to the United States?

The Master's ruling on each issue was in the negative. He has recommended that all exceptions to the accountings be overruled, and that the accountings be approved as filed.

Before this Court, Louisiana has filed exceptions only to the Special Master's recommendations as to the first stated

issue. The United States has filed exceptions only as to the second stated issue. The Master's recommendations as to the third stated issue, concerning money collected by Louisiana as severance taxes, thus are not the subject of any exceptions here.[1] In the absence of present controversy we accept the Special Master's recommendations on that issue. We consider the exceptions to the other issues in turn.

## III

### The First Stated Issue

The Interim Agreement of October 12, 1956, between the United States and Louisiana, referred to in this Court's "Final Decree" of December 12, 1960, see 364 U. S., at 503, came into being after the Court, on June 11, 1956, had provided:

> "IT IS FURTHER ORDERED that the State of Louisiana and the United States of America are enjoined from leasing or beginning the drilling of new wells in the disputed tidelands area pending further order of this Court unless by agreement of the parties filed here." 351 U. S. 978.

The Interim Agreement recites that the parties "desire to provide for the impoundment of . . . sums . . . payable under mineral leases in the disputed area, pending the final settlement or adjudication of the said controversy." App. to Reply Brief for Louisiana 9a. It divided the submerged lands off the Louisiana coast into four zones therein described. The zone contiguous to the coastline was designated as Zone 1, the next most seaward as Zone 2, the next as Zone 3, and the most

---

[1] The United States asserts:

"For a variety of reasons—including a reluctance to burden the Court with an esoteric and complex question of no recurring importance—we are not excepting to the Master's conclusion with respect to the State's obligation to pay over to the United States the severance taxes attributable to the extraction of minerals beyond State jurisdiction." Memorandum of United States in Support of Exception, p. 3.

seaward as Zone 4. *Id.,* at 10a–11a. It described the area comprising Zones 2 and 3 as the "disputed area," *id.,* at 11a, and it conferred upon the United States (with certain exceptions) the responsibility for collecting receipts from the disputed zones, *id.,* at 26a–27a. By ¶ 7 (a), the United States agreed (with exclusions not material here) "to impound in a separate fund in the Treasury of the United States a sum equal to all . . . payments heretofore or hereafter paid to it for and on account of each lease, or part thereof, in Zones 2 and 3." *Id.,* at 14a. Certain other payments were to be impounded by Louisiana. Paragraph 9 of the agreement then provides:

> "[T]he impounded funds provided for herein shall be held intact, in a separate account for each lease or portion thereof affected, by each party until title to the area affected is determined. Whereupon, except as otherwise herein provided:
>
> .    .    .    .    .
>
> "(b) Any funds derived from an area finally determined to be owned by the State of Louisiana [with an exception not here material] shall be taken from the separate and impounded fund in the Treasury of the United States provided for herein,"

and paid to the appropriate officer of Louisiana. *Id.,* at 18a–19a.

Pursuant to these provisions of the Interim Agreement, the United States collected and retained payments on mineral leases for operations within the designated disputed area. As a consequence of the first supplemental decree, entered December 13, 1965, see 382 U. S., at 293, the United States paid Louisiana some $34 million of impounded funds. Indeed, with an additional payment of some $136 million in 1975, pursuant to the supplemental decree of June 16, 1975, see 422 U. S., at 14–15, all payments due Louisiana from the funds impounded by the United States have been made. But

the United States has not paid Louisiana any interest on the funds so impounded, and has not made any payment for the use of those funds while they were held in the United States Treasury. Louisiana asserts a claim for such interest, apparently approximating $88 million, or for the value of the use of the money during the period of impoundment, and the United States resists these claims.

Louisiana's position is at least fourfold: (1) The impoundment provisions of the Interim Agreement implied a trust that imposed on the United States the fiduciary duty of a trustee in its handling of the impounded funds. It is said that an escrow arrangement in fact was established. The presence of a trust is evident from the conduct and relationship of the parties, from documentary evidence, and from admissions by federal officials. (2) The United States used Louisiana's money for its own purposes and without authority under the Interim Agreement. The funds were deposited in the general account of the Treasurer of the United States where they were available, and used, to meet cash needs of the Federal Government. (3) The United States had the duty to invest the impounded funds for the benefit of both parties. This duty is implied from the provisions of the agreement; is imposed upon the United States as a trustee as a matter of law; was breached by the refusal of the United States to honor a request by Louisiana to invest the funds; is supported by the provisions of 31 U. S. C. § 547a to the effect that "[a]ll funds held in trust by the United States . . . shall be invested" in interest-bearing securities; and is not limited by the supplemental decree of June 16, 1975. (4) Equitable remedies to prevent the unjust enrichment of the United States at the expense of Louisiana are appropriate.

We find no merit in any of Louisiana's contentions. The Interim Agreement provided only that the payments made to the United States on each lease within the disputed area were to be impounded "in a separate fund in the Treasury of the United States" and, upon determination of the owner-

ship of the land, were to be taken from that separate and impounded fund and paid to the party entitled to them. The agreement contains no express provision for the payment of interest or for the use of the funds or for investment. Neither do we find anything in the agreement's use of the word "impound" or, indeed, in Louisiana's characterization of the arrangement as an escrow (a word that does not appear in the agreement), that implies an obligation on the part of the United States to pay interest or to pay for the use of the money. The word "impound," in its application to funds, means to take or retain in "the custody of the law." Black's Law Dictionary 681 (5th ed., 1979); Bouvier's Law Dictionary 1515 (8th ed., 1914). That obligation, as is an escrow, is to hold and deliver property intact.

What actually happened here, of course, was that, as the funds were paid to the United States, the lessees' checks were cashed and the resulting cash was commingled with general funds of the Treasury and used in governmental operations. A separate account, No. 14X6709, nonetheless, was established on the books of the Treasury for these payments, and a credit entry covered every receipt from the disputed area. The United States did not stockpile that inflowing cash in a far corner of the Government vaults. But the special account was maintained and it accurately recorded the increasing potential liability of the United States to Louisiana. This was much more than a recordkeeping device. The receipts were never treated as governmental revenues. The recognition of a contingent liability, corresponding to the cash deposited, enabled the United States to make prompt payment to Louisiana without special congressional authorization or appropriation. There was no proof or even suggestion that at any time there were insufficient funds in the United States Treasury to pay any amount that might be determined to be due Louisiana from the impoundment.

Apart from constitutional requirements, in the absence of specific provision by contract or statute, or "express con-

sent . . . by Congress," interest does not run on a claim against the United States. *Smyth* v. *United States,* 302 U. S. 329, 353 (1937); *Albrecht* v. *United States,* 329 U. S. 599, 605 (1947); *United States* v. *N. Y. Rayon Importing Co.,* 329 U. S. 654, 658–659 (1947). See also 28 U. S. C. § 2516. It follows that the same is true as to any claim of duty to invest.

We are persuaded, also, that the omission, in the Interim Agreement, of any provision for interest was a conscious one. When the agreement was signed in 1956, almost $60 million in disputed revenues already had accumulated. The importance of any interest obligation was obvious. And pertinent here is the fact that two of Louisiana's negotiators candidly conceded that they did not insist on an interest clause because they knew the United States would not agree to one. Tr. 70, 95, 98, 99, 102, 103, 163. Nor does Louisiana's intimation that it was willing to pass the matter in silence because the agreement was expected to be short lived carry weight. The agreement itself specified no term, and, in its ¶ 13, it provided for operations after a year had elapsed.

We note, too, that Louisiana is not in a position to assert that it was unaware that the funds were not invested or that it did not know that the United States held itself not responsible for interest. The State received regular monthly reports of the amounts credited to the impounded account, as the agreement's ¶ 8 required. Those reports reflected no interest. Louisiana accepted the $34 million distribution, made pursuant to the 1965 decree, without complaint about the absence of interest. And communications flowed from officers of the State and its representatives in Congress, suggesting the deposit of some of the funds in Louisiana banks, presumably so that they might enjoy the free use of those funds. The Louisiana Legislature, it is true, on June 6, 1967, by House Concurrent Resolution No. 251, did call upon the United States "to take such steps as are necessary to effect a prudent and effective investment of the funds now and here-

after so impounded." See 1967 Louisiana Legislative Calendar 161–162. The quoted language, however, was only precatory and suggestive; it was not demanding. At most, it amounted to a request for a change of status. A Treasury official, pleading absence of authority, promptly returned a negative answer. In fact, Louisiana apparently never took the position that it was entitled to interest upon, or payment for the use of, its share of the impounded funds until 1975 when it filed its objections to the accounting. And Louisiana made no request for modification of the Interim Agreement. The State thus acquiesced for two decades.

We conclude that the United States fulfilled the obligations imposed upon it by the agreement; that the impoundment served its intended purpose; that there is no liability on the part of the United States for interest or for the use of the funds; and that the United States has no further obligation for payment beyond those it has performed.

## IV

### The Second Stated Issue

This issue concerns money paid to Louisiana by oil and gas lessees since 1950 in respect to Zone 1 areas now adjudicated to the United States. Louisiana asserts a right permanently to retain that money. The amount involved is some $19 million.[2]

---

[2] Louisiana's total receipts attributable to the federal lands in Zone 1 since 1950 amount to some $23 million. This figure, however, includes the severance taxes (the third stated issue) to which the United States no longer makes claim. The United States calculates that Louisiana will be indebted to it for some $19 million if its exception to the second stated issue is sustained. It concedes, however, that Louisiana would be entitled to an offset for unimpounded moneys, received by the United States from Louisiana's submerged lands, in excess of $5 million. Memorandum of United States in Support of Exception, pp. 40–41, n. 23. We recognize that Louisiana argues that its indebtedness will be much smaller even if the United States' position is sustained.

During the past three decades these federal lands have been administered by Louisiana. Before the Interim Agreement of 1956, Louisiana acted unilaterally in leasing those areas; after that date, it acted with the acquiescence of the United States given by the agreement.

The Special Master concluded that, by permitting Louisiana to administer Zone 1, the United States waived its rights to demand an accounting of, and payment with respect to, the revenues derived from its lands in the Zone. The Master did acknowledge that the very opposite result "would certainly be the case in the absence of any adjudication or agreement between the parties to the contrary." Supplemental Report 15. He found a waiver on the part of the United States, however, that centered in a provision of the Outer Continental Shelf Lands Act, 43 U. S. C. § 1336, which he read as foreclosing the federal claim to the money. He noted that the Interim Agreement contained no specific language regarding payments derived from leases on areas lying within Zone 1 or Zone 4, although it did with respect to revenues derived from leases on areas lying within Zones 2 and 3. He stressed ¶ 6 of the agreement, which provided that notwithstanding any adverse claim, Louisiana, as to any area in Zone 1 (and the United States, as to any area in Zone 4), "shall have exclusive supervision and administration, and may issue new leases and authorize the drilling of new wells and other operations without notice to or obtaining the consent of the other party." App. to Reply Brief for Louisiana 14a. Louisiana, in fact, collected rentals on mineral leases on areas in Zone 1. The United States did not question Louisiana's right to do so. The Master observed that Louisiana anticipated the possibility that some portions of Zone 1, upon which it granted leases, might ultimately be adjudged to belong to the United States, for it inserted in almost all the leases a provision to the effect that it was granting the right to extract minerals only from those parts of the leasehold areas owned by Louisiana. The conclusion the Master drew was that Louisiana was entitled to

keep all rentals derived prior to the entry of the supplemental decree of June 16, 1975, from leases upon areas lying within Zone 1, and that the United States had no right to recover them.

We are constrained to disagree with the Special Master on this issue. We accept the submission of the United States that the "ground rules" of the controversy were laid down in 1950. The Court's very first decree, issued December 11, 1950, specified, 340 U. S., at 900, that the United States was entitled to an accounting from Louisiana of all sums derived by the State from lands adjudicated to the United States. This was a principle laid down independently of the not-yet-enacted Submerged Lands Act and Outer Continental Shelf Lands Act. The principle had its roots in the Court's decision in *United States* v. *California,* 332 U. S. 19 (1947).

The Submerged Lands Act of 1953 did not change the ground rules. It released and "confirmed" a coastal belt to the coastal States, and the United States thereby "release[d] and relinquishe[d] all claims of the United States . . . for money . . . arising out of [past] operations" within the belt. 43 U. S. C. § 1311 (b)(1). For areas seaward of that belt, however, the States' obligation to account and pay remained unchanged. This Court's decision of May 31, 1960, in the second suit, was unambiguous on this matter, and the Court made plain the continued vitality of the original ground rules. 363 U. S., at 7, 83, and n. 140. The cited footnote stated flatly:

> "On June 5, 1950, the date of this Court's decision in the *Louisiana* and *Texas* cases, all coastal States were put on notice that the United States was possessed of paramount rights in submerged lands lying seaward of their respective coasts. . . . [T]he United States remains entitled to an accounting for all sums derived since June 5, 1950, from lands not so relinquished [by the Submerged Lands Act]."

The preceding Interim Agreement of October 1956 was forced into being by continuing conflict, by an injunction obtained by Louisiana in its courts, and by the injunction issued by this Court on June 11, 1956. See 351 U. S. 978. As we have noted, the agreement divided the submerged lands into the four zones hereinabove described. The first, nearest the shore, was to be administered by Louisiana. The others were to be administered by the United States, except for certain leases already granted by Louisiana in Zone 2 and the requirement of state concurrence for any new leasing in that zone. Receipts from Zones 2 and 3 were to be "impounded." No such impoundment obligation, however, was imposed on the United States with respect to Zone 4 or upon Louisiana with respect to Zone 1.

It turned out that the seaward boundary of Louisiana's submerged lands, as finally determined, does not coincide with the line that divided Zones 1 and 2. The final boundary meanders back and forth across the agreement's line between those two Zones producing bulges on each side. Louisiana has been successful in some of its claims to lands within Zone 2, and the United States has accounted for and paid over funds received from those areas. Yet Louisiana denies any corresponding obligation to account for and pay over revenues it received from those portions of Zone 1 that the United States has successfully claimed.

Louisiana asserts that the United States, by the Interim Agreement, waived and abandoned its right to revenues from Zone 1 during the life of the agreement. The agreement itself contains no express words of waiver. On the other hand, neither does it provide specifically for eventual repayment of any revenues from portions of Zone 1 ultimately adjudicated to the United States. But the agreement does recite: "nor shall any provision hereof be the basis for . . . waiving in any manner any right, interest, claim, or demand whatsoever of either party now pending in the proceedings above referred

270

to, or otherwise." App. to Reply Brief for Louisiana 9a. And it further recites that the baseline from which the several zones were measured had not been surveyed or finally fixed, and that no inference was to be drawn from the use of that baseline. *Id.*, at 10a. These provisions of the agreement persuade us that each party specifically was reserving any monetary claims it might have outside Zones 2 and 3.

It was to be expected, of course, that most of Zone 1 would ultimately be adjudicated to Louisiana. This fact accounts for the decision to permit the State to enjoy, for the interim, the revenues from that area.[3]

The Outer Continental Shelf Lands Act was the complement of the Submerged Lands Act, for it provided in detail for the administration of federal submerged lands lying beyond those granted to the coastal States. It authorized an agreement with a State "respecting operations under existing mineral leases" and the issuance of new leases "pending the settlement or adjudication" of a controversy as to ultimate ownership. 43 U. S. C. § 1336. This provision is referred to in the Interim Agreement, and it is the one on which the Special Master focused his attention. The Master placed particular stress on the following sentence in the statute:

"Payments made pursuant to such agreement, or pursuant to any stipulation between the United States and a State, shall be considered as compliance with section 1335 (a)(4) of this title."

The Master viewed the payments made by Louisiana's lessees in Zone 1 as governed by this language and concluded

[3] We see no substance in the fact that most, but not all, of the leases granted by Louisiana in Zone 1 referred to lands owned by the State. Some of these antedated the Interim Agreement, and we read them all as merely repeating an established pattern. The recital hardly is acceptable as a device that is at once self-serving for Louisiana and capable of being detrimental to the lessees who surely thought they were getting, and paying for, full value.

that any federal claim with respect to those payments was foreclosed.

We do not so read that sentence. The provision, we feel, means no more than that a lessee is not in default so long as the agreement remains in effect and he makes the payments required by it. The Act protects the lessee. Whatever the lessee's ultimate obligation, if any, to the United States might turn out to be, there is no basis for reading into § 1336 a waiver by the United States of Louisiana's independent duty to account, or a waiver of any claim for money due the United States. The State's obligation does not derive from the Shelf Lands Act; it was imposed by this Court's 1950 decree, was not waived by the Interim Agreement, and is not excused by the quoted provision of the Shelf Lands Act.

This conclusion is buttressed by the fact that until 1975 the actions of the parties and the rulings of this Court consistently indicate that this was the common understanding. The 1960 decree was prepared by the parties at the invitation of the Court. 363 U. S., at 85. The decree itself recognized that once the coastline was determined, Louisiana was to account and to pay. 364 U. S., at 503. The decree of December 13, 1965, although distinguishing between impounded and nonimpounded·funds, contained no waiver of any obligation relating to receipts that were not impounded. 382 U. S., at 294. This Court's decision of March 17, 1975, 420 U. S. 529, and the implementing decree of June 16, 1975, 422 U. S. 13, recognized that in some places the true limit of Louisiana's submerged lands was shoreward of the Zone 1 line. That decree, also, was proposed by the parties at the invitation of the Court. 420 U. S., at 530. It declared rights divided by a specified boundary line which, in many places, did not correspond with the seaward edge of Zone 1. It required each party to account for and to pay over impounded revenues attributable to lands adjudicated to the other. 422 U. S., at 15–16. We see no reason to conclude that those accounting provisions were included only for informational

purposes, rather than to spell out the parties' pecuniary obligations.[4]

### V

In summary: We accept, upon acquiescence of the parties, the Special Master's recommendations that Louisiana has no obligation to account for and to pay to the United States money collected by it as severance taxes on minerals removed from areas adjudicated to the United States. We agree with and accept the Special Master's recommendations that the United States is not obligated to account for and pay Louisiana either the value of the use of Louisiana's share of the impounded funds or interest upon that portion of those funds. We therefore overrule Louisiana's exceptions to the supplemental report of the Special Master. We disagree with and do not accept the Special Master's recommendations with respect to Louisiana's obligation to account for revenues derived by it from mineral leases on areas within Zone 1 adjudicated to the United States. Instead, we sustain the exception of the United States and rule that Louisiana does have the obligation to account for such revenues received by it. Subject to this ruling, the respective accountings are approved as filed.

We leave to the Special Master and the parties the determination of the final amount due and owing, and of the

---

[4] We note that the conclusion we reach should entail no pressing hardship for Louisiana. Apart from the fact that Louisiana will be disgorging United States funds it has enjoyed for many years and will be doing so in depreciated dollars without interest, the United States has represented to this Court that accumulated impounded receipts attributable to state lands from "split leases" exceed the sum now claimed from Louisiana. The accounting of the split lease revenues is not yet due. See 422 U. S., at 16–17. The United States asserts, however, that it is content to defer payment from Louisiana until the split lease impounded fund accounting is settled, and to waive the benefit of the absence of offset provisions if Louisiana does likewise. Memorandum of United States in Support of Exception, p. 40.

method of payment. The case is remanded to the Special Master for further proceedings.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, with whom MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

I concur in the Court's opinion except with respect to its disposition of the "second stated issue." *Ante,* at 266–272. As framed by the Special Master, the second issue is whether Louisiana has "the obligation to account for revenues received by it from mineral leases on areas lying within Zone 1. . . ." *Ante,* at 260. The Special Master found that the State had no such obligation. The United States filed an exception, and the Court sustains it.

I would accept the recommendations of the Master on all three issues, including his finding that Louisiana has no obligation to account for revenues derived from Zone 1. The latter finding certainly is not free from doubt, but the able Master has a more intimate familiarity with this "long-continuing and sometimes strained controversy," *ante,* at 254, than an appellate judge possibly can acquire by studying only the available record. Although we have the duty to make an independent judgment, I cannot conclude that the Master's finding on the second stated issue is erroneous. Accordingly, I dissent on this issue.