NATIONAL ASSOCIATION OF COUNTIES, et al., Plaintiffs,

v.

James A. BAKER, III, Secretary of the Treasury, Defendant.

Civ. A. No. 87–0414.

United States District Court, District of Columbia.

July 28, 1987.

David C. Vladeck, Alan B. Morrison, Thomas H. Stanton, Wellford, Wegman & Hoff, Washington, D.C., for plaintiffs.

Felix V. Baxter, Civil Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiffs National Association of Counties, National League of Cities, United States Conference of Mayors, and ten individual cities and counties, seek declaratory and injunctive relief to compel defendant to release to 39,000 local governmental units approximately $180 million appropriated for fiscal year 1986 by Congress under the State and Local Government Fiscal Assist-

ance Act of 1972 ("Revenue Sharing Act") to the State and Local Government Federal Assistance Trust Fund ("Trust Fund") but sequestered under the Balanced Budget and Emergency Deficit Control Act of 1985 ("Gramm-Rudman"). The matter comes before the Court on the parties' cross-motions for summary judgment.[1] For the reasons set forth below, plaintiffs' motion is granted.

### I. Factual Background

Under the Revenue Sharing Act, 31 U.S.C. § 6701, Congress provides non-categorical financial assistance to local governmental units, including cities and counties, in the form of annual entitlement grants. Payments under the Act are made through the Trust Fund, of which the Secretary of the Treasury is personally the Trustee. *Id.* § 6703.

In November 1985, Congress appropriated a total of $4,566,700,000 to the Trust Fund for the "entitlement period" beginning October 1, 1985 and ending September 30, 1986 (coinciding with fiscal year 1986), but reduced payments from the Trust Fund by $381,700,000 to $4,185,000,000 through a reduction in the final quarterly payment. Pub.L. 99–160, 99 Stat. 909, 924 (Nov. 25, 1985). *See* 31 U.S.C. § 6703(b)(2).

In December 1985, Congress passed and the President signed into law the Gramm-Rudman legislation, Pub.L. 99–177, 99 Stat. 1037 (Dec. 12, 1985), which required an across-the-board sequestration of fiscal year 1986 funding for each "program, project or activity" by a certain percentage determined by the Comptroller General. *See* §§ 251–252.

On February 1, 1986, the President issued an order pursuant to Gramm-Rudman sequestering, among other budget items, $179,955,000 (or 4.3%) of the Trust Fund monies. In late February, the Office of Revenue Sharing ("ORS") of the Department of Treasury implemented the order and directed that the approximately $180 million of the Trust Fund be sequestered and set aside in a special account. Affida-

---

**1.** Defendant has styled its motion alternatively as a motion to dismiss.

vit of Kent A. Peterson, Deputy Director and Acting Director for the ORS ("Peterson Affidavit"), para. 7 (attaching memorandum of former ORS Director Michael F. Hill).[2]

On April 7, 1986, about two months after the Gramm-Rudman sequestration order, the President signed the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), which terminated and provided for the winding down of the general revenue sharing program with the close of the 1986 entitlement period. Pub.L. 99–272, 100 Stat. 327, § 14001 (1986).

In July 1986, the Supreme Court invalidated the President's February sequestration order, *Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), but Congress subsequently passed and the President signed legislation which affirmed and ratified the President's earlier action. P.L. 99–366 (July 31, 1986). The $180 million reduction in payments to the local governmental units was effected in the third and fourth quarterly payments for the 1986 entitlement period, issued July 7 and September 30, 1986, respectively. Peterson Affidavit, para. 8.

On January 14, 1987, plaintiff National League of Cities requested the Secretary of the Treasury to release the $180 million sequestered under Gramm-Rudman. Pls. Exh. A. The Secretary, through Deputy Assistant Secretary Robert W. Rafuse, Jr., informed the National League of Cities on January 30, 1987, that the funds would not be released and would instead be returned to the General Fund of the Treasury. Pls. Exh. B. On February 6, 1987, plaintiff National Association of Counties also requested the Secretary to release the funds. Pls.Exh. C. Rafuse replied on February 18, 1987, that the sequestered funds had already been returned to the General Fund of the Treasury. Pls.Exh. D. Plaintiffs filed this action for declaratory and injunctive relief the next day. The Court has expedited review of this action in light of the congressional restriction that local governmental units must use, obligate, or appropriate all Trust Fund monies by October 1, 1987. COBRA, § 14001(a)(5).

## II. Analysis

The question before the Court is a relatively narrow one of statutory interpretation: was the Secretary of the Treasury acting within his statutory authority in refusing to disburse and instead returning to the General Fund the $180 million in Trust Funds of the 1986 entitlement payments to local governments under the revenue sharing program that was sequestered under Gramm-Rudman? The parties agree that the relevant facts are undisputed and that the case is appropriate for summary judgment. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The problem in statutory interpretation posed by this case results in part from Congress' failure to explicate fully the relationship between certain provisions of the three major federal statutes affecting the current status of the general revenue sharing program: the Revenue Sharing Act, Gramm-Rudman, and COBRA. Plaintiffs urge that the plain language of the statutes and congressional intent clearly lead to the conclusion that the sequestered funds survived the 1986 fiscal year and should now be paid to local governments. Looking at the same statutes, defendant argues to the contrary that the funds "lapsed" at the conclusion of the 1986 entitlement period, and therefore that he has no authority to make any further payments and is obligated to return the funds to the general treasury. There is no dispute, at least, that the plain language of the relevant statutes is the proper starting point for the analysis. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Absent a "clearly expressed legislative intention to the contrary," that language is conclusive. *Id.*

---

**2.** Plaintiffs do not in this action challenge the legality of the sequestration order, but focus instead on defendant's subsequent handling of those sequestered funds.

The statutory framework for the question posed begins with Gramm-Rudman, which although it effected the sequestration for fiscal year 1986, left the Trust Fund undisturbed in the long-term. Gramm-Rudman specifically provides that "[a]ny amount ... which is sequestered or reduced ... is permanently cancelled, *with the exception of amounts sequestered in special or trust funds*, which *shall remain in such funds* and *be available* in accordance with and to the extent permitted by law, including the provisions of this Act." Gramm-Rudman, § 256(a)(2). The clear import of this language is that the $180 million of the Trust Fund that was sequestered was to remain "available" and be distributed according to the relevant authorizing statute and any subsequent legislation. In short, Gramm-Rudman froze $180 million of the Trust Fund for one fiscal year.

The Court does not agree with defendant that survival of the sequestered funds renders Gramm-Rudman a "nullity." Defendant's Reply Memorandum in Support of Motion to Dismiss Or, in the Alternative, Cross-Motion for Summary Judgment, at 16–19. The purpose of sequestration, as opposed to cancellation (which Congress expressly mandated for other programs) was to reduce the size of the 1986 deficit, *not* the deficit in succeeding fiscal years, which could be addressed in subsequent sequestration orders. The payment of the remainder of the 1986 grants in fiscal year 1987 is not inconsistent with the Gramm-Rudman scheme. The impact of such a delay was well recognized by the executive branch as explained in a letter dated May 12, 1986 from the Office of Management and Budget ("OMB") to Senator Malcolm Wallop, which states that "amounts sequestered in FY 1986 from non-exempt accounts [special or trust funds] *will become available* for obligation on October 1, 1986, unless some other provision in each account's authorizing statutes or a subsequent act of Congress prevents any subsequent expenditure. The impact to the deficit will be to *increase the deficit* to the extent that such sequestered funds from FY 1986 are expended in FY 1987, thereby increasing outlays." Plaintiffs' Exhibit ("Pls.Exh.") P (emphasis added). The Comptroller General was also of the opinion that trust funds sequestered under Gramm-Rudman would be "carried over" into the next fiscal year. Pls.Exh. R. Further confirmation of this interpretation of Gramm-Rudman is found in the fact that defendant has released and made available to these beneficiaries trust and special funds for a wide range of other programs. Affidavit of Victor J. Miller, Pls.Exh. S, para. 8. Defendant argues that these programs are distinguishable from the Trust Fund because unlike these other programs, the revenue sharing program was "terminated" by COBRA. Defendant's argument is unpersuasive, however, because as discussed below, far from cancelling the Trust Fund monies, COBRA specifically protected the 1986 entitlement funds from premature expiration.

The conclusion that the sequestered funds would be resuscitated after fiscal year 1986 is also strongly supported by the general legislative scheme of the Revenue Sharing Act. Congress gave the Trust Fund monies vigor beyond that given to a typical appropriation. The Act provides that "[a]mounts in the Trust Fund—remain available until expended." 31 U.S.C. § 6703(a)(2). Trust Fund monies are, accordingly, "no year" monies that may be expended without regard to the particular fiscal year. *See National Association of Regional Councils v. Costle,* 564 F.2d 583, 587 n. 8 (D.C.Cir.1977) ("*NARC*") (budget authority made "available until its objectives are attained is 'no-year' authority"); General Accounting Office, *Principles of Federal Appropriation Law,* ch. 4, 6–7 (1st ed. June 1982). The legislative history of the Revenue Sharing Act supports this interpretation of the statute's plain language. S.Rep. No. 92–1050, 92d Cong., 2d Sess. 19–20 (1972); H.R.Rep. 92–1018, 92d Cong., 2d Sess. 32–33 (1972), U.S.Code Cong. & Admin.News 1972, pp. 3874, 3892. ("[m]oney appropriated to the trust fund is to be available without fiscal year limitation.") Further evidence of Congress' intent that the Trust Fund monies would not

lapse at the end of the fiscal year is the plain language of section 6702 which states that grant payments under the Act are made "*for* each entitlement period," not, as defendant suggests, "in" each entitlement period.

Congress clearly entrusted to the Secretary the responsibility to ensure that local governments received their entitlement grants without regard to the technical constraints that might be imposed by fiscal years. For example, the Revenue Sharing Act explicitly allows the Secretary to make payments after the expiration of the fiscal year that coincides with the entitlement period. *See* § 6702(b) (payments may be made up to five days after the end of the quarter); § 6702(c) (payments to adjust grants that have been over- or underpaid may be made without fiscal year limitation); § 6702(d) (establishes reserve fund to withhold a portion of allocations for adjustment payments, which grantees receive only after the end of the entitlement year). Plaintiffs claim that the Secretary has in fact made considerable payments to local governments in fiscal year *1987* in the form of adjustments in grants for prior entitlement years. Plaintiffs' Reply Memorandum in Support of Motion for Summary Judgment, at 14. This interpretation of Congress's intent to ensure grants were made is consistent with the status of the revenue sharing program as an *entitlement* program. Congress gave local governments certain rights under the Revenue Sharing Act to demand their full grant for each entitlement period:

> (a) Each unit of general local government *is entitled* to an amount equal to any amount allocated to the government under this chapter for each entitlement period.... The Secretary of the Treasury *shall pay* each amount out of the State and Local Government Fiscal Assistance Trust Fund under section 6703 of this title.

31 U.S.C. § 6702(a) (emphasis added). Thus, Congress made clear that once local governments meet the necessary criteria for payment—based on population, tax effort, and per capita income—they are *entitled* to receive funds from the Trust Fund.

The statute does not give the Secretary discretion to increase or decrease the entitlement grants except in accordance with the statutorily prescribed formula for determining the amount of payment. *See* 31 U.S.C. § 6707. The entitlement status of the grants, which arises once Congress has appropriated the funds, guarantees the program beneficiaries "a legal right to receive federal ... funds by virtue of certain congressional enactments and under the terms prescribed therein. Violation of such a statutory right normally creates a justiciable cause of action even without a specific statutory authorization for review." *Oklahoma v. United States Civil Service Commission*, 330 U.S. 127, 136, 67 S.Ct. 544, 550, 91 L.Ed. 794 (1947). The federal government can only deny payment of the full amount of entitlement grants to beneficiaries if the recipient does not comply with the applicable standards, *see, e.g., Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981), or where there has been an intervening change in the law expressly authorizing nonpayment. *See, e.g., United States v. Larionoff*, 431 U.S. 864, 879, 97 S.Ct. 2150, 2159, 53 L.Ed.2d 48 (1977); *NARC*, 564 F.2d at 586–90. Defendant argues that COBRA constituted such an intervening change in the law.

Defendant contends that his actions were proper because COBRA terminated the revenue sharing program and deprived him of authority to disburse the sequestered funds beyond fiscal year 1986. A close examination of COBRA, however, leads to the opposite conclusion and bolsters plaintiffs' argument that Congress deliberately sought to protect the Trust Fund from at least some of its recent budget-cutting enthusiasm. COBRA made fiscal year 1986 the last year for which Congress appropriated revenue sharing program funds, Pub.L. 99–160, 99 Stat. 909, 924 (1985), and provided for the winding up of the program's administration. COBRA also directed, however, that

> [t]he Secretary of the Treasury shall continue to be the trustee of the Trust Fund,

*which shall remain in existence until all entitlement payments* which are required to be made under the Revenue Sharing Act are made in accordance with the terms of such Act. Any funds remaining in the Trust Fund after all of such entitlement payments are *completely made* shall revert to the General Fund of the Treasury of the United States. COBRA, § 14001(a)(2) (emphasis added). Congress made quite clear that it expected that *all* entitlement payments under the Revenue Sharing Act would be made: "[n]othing in this section shall be construed to prevent the payment of any allocation for the entitlement period ending September 30, 1986." *Id.* § 14001(e)(3). Congress even repeated the admonition when it directed the Secretary to transfer funds to the General Fund of the Treasury only "after *all* of such entitlement payments are *completely* made." *Id.* § 14001(a)(2) (emphasis added).

█ Given such a clear expression of congressional intent in the Revenue Sharing Act, Gramm-Rudman, and COBRA, it is evident that defendant has improperly refused to disburse the sequestered funds and cannot justify his actions in transferring the funds to the general fund. The Secretary can refuse to expend funds appropriated by Congress only where spending discretion has been expressly conferred by Congress itself—in the provisions establishing a given program, in the relevant spending statutes, or in some other provision of law. *Train v. City of New York,* 420 U.S. 35, 44–48, 95 S.Ct. 839, 844–47, 43 L.Ed.2d 1 (1975); *City of New Haven v. United States,* 809 F.2d 900 (D.C.Cir.1987); *State Highway Commission of Missouri v. Volpe,* 479 F.2d 1099 (8th Cir.1973); *Kennedy v. Mathews,* 413 F.Supp. 1240, 1245 (D.D.C.1976) ("There is no longer any doubt that in the absence of express Congressional authority to withhold funds appropriated for implementation of a legislative program the executive branch must spend all funds.") As discussed above, the legislative scheme and various provisions of the statutes at issue clearly indicate that Congress sought to deny the Secretary such discretion. To the contrary, Congress

purposefully insulated the Trust Fund from Executive interference.

█ Defendant argues its handling of the Trust Fund and interpretation of the statutes is entitled to deference because it has a "reasonable basis in law." *NRLB v. Hearst Publications,* 322 U.S. 111, 131, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944); *Chevron, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Deference is not due, however, where as here, "Congress has spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. As the Supreme Court noted, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* In addition, as plaintiffs argue, it is inappropriate to extend the principles of *Chevron* to the instant case where the question does not involve an agency's *administration* of its statutory authority, but rather is a question of divining an agency's congressional mandate. Congress clearly made defendant's role in administering the funds a restricted one, not only by making the allocation formulaic, but also by designating the Secretary as *trustee* of the funds in question, mandating that his fiduciary responsibility is to the *beneficiaries* of those funds, the local governments. Deference in these circumstances on the issue before the Court, therefore, is inappropriate.

█ Defendant argues finally that even if his actions were improper, this Court has no authority to order injunctive relief because the budget authority for the trust funds has lapsed. This argument is unavailing. Defendant's characterization of the status of the funds, of course, is inextricably linked with the analysis of the merits above. As explained above, the statutes make clear that the budget authority for the revenue sharing program did not expire with the end of fiscal year 1986, but rather continued; thus this Court has the power to order the requested injunctive relief. The cases relied on by defendant support

this conclusion. In *NARC*, 564 F.2d at 588–89, the Court of Appeals held that "since there is no specific statutory directive that [the budget authority] should remain available beyond one year," the administrator's contract authority for the fiscal years specified terminated. *Id.* at 587. The Court concluded that "unless a court can rely on a statutory authorization, it simply lacks the power to order the obligation of public funds, regardless of how appropriate a remedy that order would be." *Id.* at 590. *International Union, UAW v. Donovan*, 570 F.Supp. 210, 220 (D.D.C. 1983), *vacated on other grounds*, 746 F.2d 855 (D.C.Cir.1984), *cert. denied*, 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985) (courts have power to order funds be held available beyond their statutory lapse if equity requires and suit filed before budget authority lapsed). The Court has little difficulty in finding here a "specific statutory directive" of continuing budget authority for the Trust Fund monies. As discussed above, Congress specifically protected these funds beyond the expiration of the fiscal year 1986. *See Commonwealth of Pennsylvania v. Weinberger*, 367 F.Supp. 1378 (D.D.C.1973) (court retains equitable powers in impoundment case where Congress directed that unexpended funds remained available for obligation and expenditure during succeeding fiscal year); *Louisiana v. Weinberger*, 369 F.Supp. 856, 860–01 (E.D.La.1973); *cf. NAACP, Lake County Chapter v. City of Painesville*, No. 86–2822 (N.D. Ohio Apr. 14, 1987) (in discrimination suit under Revenue Sharing Act, relief sought was "prospective" and therefore moot as Secretary no longer had power to provide funds).

### III. Conclusion

In conclusion, for the reasons set forth above, plaintiffs are entitled to the relief they seek [3] and this Court has the power to order that relief. Accordingly, plaintiffs' motion for summary judgment is hereby granted. A separate order and judgment accompanies this Memorandum Opinion.

IT IS SO ORDERED.

### ORDER AND JUDGMENT

In consideration of plaintiffs' and defendant's cross-motions for summary judgment, and the Memorandum Opinion issued this date, it is accordingly hereby ordered that plaintiffs' motion is hereby granted and defendant's motion is hereby denied; and it is

ORDERED AND ADJUDGED that under the Revenue Sharing Act, 31 U.S.C. § 6701 and the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub.L. 99–272, 100 Stat. 327, § 14001, defendant James A. Baker, III, Secretary of the Treasury, is obligated to disburse to local governmental units under the revenue sharing program in accordance with the other relevant provisions of the Revenue Sharing Act the $179,955,000 sequestered under the Balanced Budget and Emergency Deficit Control Act of 1985 ("Gramm-Rudman") for the entitlement period of October 1, 1985 through September 30, 1986 and his failure to do so was in violation of these statutes; it is

FURTHER ADJUDGED that the transfer by James A. Baker, III, Secretary of the Treasury, of the sequestered funds out of the State and Local Government Fiscal Assistance Trust Fund was not authorized by law and was in violation of both the Revenue Sharing Act and COBRA, § 14001(a)(2); it is

FURTHER ORDERED that James A. Baker, III, Secretary of the Treasury, shall forthwith transfer $179,955,000 from the General Fund of the Treasury of the United States to the State and Local Govern-

---

**3.** In their complaint, plaintiffs request "accrued interest" in addition to the sequestered amounts. Complaint, at 9. It is well established that interest cannot be recovered in a suit against the federal government in the absence of express waiver, by contract or statute, or sovereign immunity from an award of interest. *Library of Congress v. Shaw*, — U.S. —, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986); *United States v. Louisiana*, 446 U.S. 253, 100 S.Ct. 1618, 64 L.Ed.2d 196 (1980). Plaintiffs have not demonstrated any contractual or statutory basis for their request for interest, and indeed, failed to respond in their reply to defendant's challenge on this issue. Accordingly, interest shall not be awarded.

ment Fiscal Assistance Trust Fund; and it is

FURTHER ORDERED that James A. Baker, III, Secretary of the Treasury, shall on or before August 18, 1987 disburse to each local government entitled to payment under the revenue sharing program the appropriate amounts from the sequestered funds.

Judgment is hereby entered in favor of plaintiffs National Association of Counties, National League of Cities, United States Conference of Mayors, the City of New York, the City of Kansas City, the City of Erie (Pennsylvania), Cuyahoga County (Ohio), Milwaukee County (Wisconsin), Riverside County (California), San Bernardino County (California), San Diego County (California), Shelby County (Tennessee), and Ventura County (California), and against James A. Baker, III, Secretary of the Treasury.

IT IS SO ORDERED.