Mary COSGROVE, et al., Plaintiffs,

v.

Louis W. SULLIVAN, in his capacity as Secretary of the Department of Health and Human Services, et al., Defendants.

No. 85 Civ. 4472 (GLG).

United States District Court,
S.D. New York.

Feb. 6, 1991.

See also 759 F.Supp. 166.

Brown & Seymour (Whitney North Seymour, Jr., Craig A. Landy, of counsel), New York City, for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., by Lorraine S. Novinski, Sp. Asst. U.S. Atty., New York City, for defendants.

OPINION

GOETTEL, District Judge.

In 1986, plaintiffs Mary Cosgrove, *et al.* commenced a nationwide class action

against defendants Otis Bowen, the Secretary of the Department of Health and Human Services ("HHS") to challenge an administrative regulation used to determine reimbursement levels for certain physician services under Part B of the Medicare program. Plaintiffs are now applying for an order compelling Louis W. Sullivan, the current Secretary of the Department of Health and Human Services, to pay interest on underpayments to the plaintiff class arising from the court's final judgment of November 16, 1988 ordering recalculation of the customary charges for the Part B services they received.

## I. FACTUAL BACKGROUND

The named plaintiffs in this class action are individuals enrolled in Part B of Medicare, a federally subsidized voluntary health insurance program for persons age 65 and older or who are disabled. The defendants are Louis W. Sullivan, the current Secretary of the Department of Health and Human Services[1] (the "Secretary") and the Administrator of the Health Care Finance Agency, the division that administers the Medicare program.[2]

This case has lingered before this court for many years. Since we have no desire to reiterate its intricate history, reference should be made to this court's earlier decision for a more complete explanation of the factual background. See Cosgrove v. Sullivan, 649 F.Supp. 1433 (S.D.N.Y.1986). However, almost three years have passed since the court last spoke in this case on the merits. Therefore, we shall briefly outline what has passed before so that what is before us today will be understandable.

Each of the plaintiffs was reimbursed by an insurance carrier designated to process their Part B claims for charges they had submitted in connection with surgery they

each underwent between 1984 and 1986. Part B of the Medicare program supplements Part A's coverage of institutional health costs by insuring against a portion of other medical expenses. Eligible individuals who choose to enroll in the Part B program pay monthly premiums. See 42 U.S.C. § 1395j et seq. (1988).

Generally, reimbursement levels for Medicare Part B claims are based upon the "reasonable charges" for particular medical services. 42 U.S.C. § 1395u(b). In this case, reimbursements were determined by calculating the "customary charges" under 42 C.F.R. § 405.551(e) in conjunction with provisions of the Deficit Reduction Act of 1984 ("DEFRA"). The combined effect of these provisions was to freeze reimbursement rates for services performed by certain physicians who had switched to direct fee-for-service billing on or after November 1, 1982. As a result, the reimbursements received by plaintiffs fell far below the actual charges billed directly to them by their physicians.

Plaintiffs, who include both direct Medicare beneficiaries and physicians holding assigned claims, filed a class action against the Secretary challenging the continued application of 42 C.F.R. § 405.551(e) as arbitrary and capricious. This court agreed and ordered defendants to recalculate the reasonable charges for services rendered by the fee-for-service physicians. See Cosgrove v. Bowen, 649 F.Supp. at 1439. On November 16, 1988, the court entered a final judgment certifying the class and ordering defendants to require all Medicare carriers under their jurisdiction, after recalculating the customary charges, to pay to the plaintiff class 80% of any resulting increase in the reasonable charges that were due to the plaintiff class.[3] To ensure

---

1. This action was originally commenced against Secretary Otis Bowen. After Bowen resigned his position, he was replaced by the current Secretary, Louis W. Sullivan. Secretary Sullivan was substituted as a defendant under Fed. R.Civ.P. 25(d)(1). Since this substitution has no substantive effect on the case, we shall refer to the defendant Secretary throughout this opinion.

2. During our discussion, we shall use the terms "defendants" and "Secretary" interchangeably to refer to all of the defendants in this case. Use of either term is not intended to imply any meaningful distinction between defendants.

3. The Final Judgment stated in part:
    FURTHER ORDERED, ADJUDGED AND DE-CREED that defendants are ordered and di-

compliance, the court also ordered the defendants to report to the court their progress in the recalculations at least once every six months.

On appeal, the Second Circuit affirmed the district court's decision. Specifically, the circuit court agreed that it was arbitrary and capricious for the Secretary to continue to base Medicare patient reimbursements for physicians' services on physicians' hospital salaries years after the physicians had switched to fee-for-service billing. *Cosgrove v. Bowen*, 898 F.2d 332 (2nd Cir.1990).

This court, responding to substantial delays by defendants in completing the recalculation ordered in the 1988 Final Judgment, appointed a special master on August 20, 1991 to monitor the defendants' compliance. To date, defendants have only liquidated a portion of the plaintiffs' claims. The court-appointed special master, in his first report dated January 29, 1992, stated that as of December 31, 1991, more than three years after the court's Final Judgment, defendants have recalculated and paid approximately $45 million to eligible physicians and beneficiaries. First Report of Special Master, 85 Civ. 4772 (GLG) (S.D.N.Y. Jan. 29, 1992), at 1–2. Of the twenty Tier II carriers who already possess the information necessary to complete all recalculations and payments required by the Final Judgment, seventeen have completed their payments. *Id.* at 8 n. 5. Progress by other carriers, including those classified in Tier IV and V who currently lack all of the data necessary for recalculations of plaintiffs' proper reimbursements, has been less forthcoming to date.

Plaintiffs now seek an order compelling defendants to pay to the plaintiff class interest on underpayments that has been accruing since November 16, 1988, the entry date of this court's final judgment.

rected to require all Medicare carriers under their jurisdiction to recalculate the reasonable charges on all assigned and unassigned claims for medical services covered by this judgment and to pay eighty percent of any resulting

## II. DISCUSSION

The Medicare Act was amended by the Tax Equity and Fiscal Responsibility Act of 1982 (Pub.L. 97–248) ("TEFRA") to provide for the payment or charging of interest on underpayments and overpayments to Medicare physicians and providers. In cases involving Medicare Part B reimbursements, Congress provided:

> Whenever a final determination is made that the amount of payment made under this part either to a provider of services or to another person pursuant to an assignment under section 1395u(b)(3)(B)(ii) of this title was in excess of or less than the amount of payment that is due, and payment of such excess or deficit is not made (or effected by offset) within 30 days of the date of the determination, interest shall accrue on the balance of such excess or deficit not paid or offset (to the extent that the balance is owed by or owing to the provider) at a rate determined in accordance with the regulations of the Secretary of the Treasury applicable to charges for late payments.

42 U.S.C. § 1395*l* (j) (1988). Plaintiffs maintain that the court's 1988 final judgment represented a "final determination" under 42 U.S.C. § 1395*l* (j) that the reimbursements received by the plaintiff class were deficient. Since more than 30 days have passed since the judgment was entered without repayment of these deficiencies, plaintiffs contend that the defendants should be directed to pay interest on the underpayments which the class is entitled to receive.

In response, defendants argue that the court's conclusion that a recalculation should be completed does not amount to a final determination that an underpayment has occurred. The Secretary, noting the implementing regulations for 42 U.S.C. § 1395*l* (j), argues that interest begins accruing once an intermediary or a carrier determines that an underpayment exists. Indeed, defendants contend that without

increase in such reasonable charges found by the carriers to be due to the appropriate claimants.

Final Judgment, No. 85 Civ. 4472 (GLG) (S.D.N.Y. Nov. 16, 1988) at 2.

access to information available to the Medicare carriers the court could not have determined whether or not claims had been underpaid or by what amounts.

Defendants also argue that, under 42 U.S.C. § 1395*l* (j), interest is only payable to providers of services and those payable pursuant to an assignment of benefits. In their view, nothing in the statute authorizes those plaintiffs who are Medicare beneficiaries with unassigned claims to receive interest payments on deficient Part B reimbursements.

Finally, defendants maintain that no final determination could have been rendered by the court because statutory provisions deny the court subject matter jurisdiction over the Part B underpayment claims which form the basis of the interest claims in this case.

Defendants' arguments concerning the issue of subject matter jurisdiction are premised upon section 1395ff of Title 42 which governs the ability of individuals to challenge Medicare benefits determinations made by the Secretary. The Historical and Statutory Notes which follow the statute state that "[t]he amendments made by subsection (a) [which provided for appeals of Part B claims] shall apply to items and services furnished on or after January 1, 1987."

Defendants argue that the effective date of the 1986 amendments allowing individuals to appeal Part B benefits determinations precludes judicial review of claims for services arising before January 1, 1987. Since all the services at issue in this case were furnished between 1984 and 1986, defendants claim that the court lacks jurisdiction to review these benefits determinations and award interest. Defendants contend that the court possessed jurisdiction only because plaintiffs challenged the Secretary's methodology for calculating the Part B reimbursements. Without jurisdiction to review the underlying Part B claims themselves, the court's earlier judgment could not have determined that the reimbursements were deficient.

This argument, however, misses the jurisdictional point. As the court noted in its earlier opinion, the jurisdictional issues of the original challenge of 42 C.F.R. § 405.-551(e) were settled by the Supreme Court. This action began when plaintiffs challenged the method by which they were reimbursed for certain medical expenses they had incurred. The Court held that challenges to the validity of the Secretary's instructions and regulations, are cognizable in courts of law. *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). It is not necessary for this court to render a determination of the actual amounts due to plaintiffs in order for it to find that the calculation method used by the Secretary caused underpayments to occur. Jurisdiction over the plaintiffs' interest claims is distinct from a court's jurisdiction to review the Secretary's determination of the amounts due for particular benefits claims by plaintiffs. As the Supreme Court has held, Congress has precluded judicial review only of Part B amount determinations by hearing officers. *Id.* at 677, 106 S.Ct. at 2139.

Furthermore, not only is defendants' reliance upon 42 U.S.C. § 1395ff's effective date misplaced, but they have wholly ignored the provisions of TEFRA that originally created the Part B interest provision and specified its effective date. Section 117(a) of TEFRA, later codified in 42 U.S.C. § 1395*l* (j), amended the Medicare Act to provide for the accrual of interest on Part B underpayments and overpayments. Section 117(b) clearly states that "[t]he amendments made by subsection (a) apply to final determinations made on or after date of the enactment of this Act [TEFRA]." Pub.L. 97–248 § 117(b); *see also* 42 U.S.C. § 1395g Note. TEFRA was enacted on September 3, 1982. Whether or not this court's 1986 opinion or 1988 final judgment constituted a final determination, these actions occurred well after TEFRA's effective date. Consequently, TEFRA unquestionably grants this court jurisdiction to decide the interest accrual issue.

Moreover, 42 U.S.C. § 1395ff does not apply to final determinations concerning

the accrual of interest. Section 1395ff(a) provides:

The determination of whether an individual is entitled to benefits under part A or part B of this subchapter, and the determination of the amount of benefits under part A or part B of this subchapter, and any other determination with respect to a claim for benefits under part A of this subchapter or a claim for benefits with respect to home health services under part B of this subchapter shall be made by the Secretary in accordance with regulations prescribed by him.

42 U.S.C. § 1395ff(a) (1988). Section 1395ff(b) then entitles individuals to a hearing before the Secretary and permits judicial review of the Secretary's final decisions concerning determinations made pursuant to 42 U.S.C. § 1395ff(a).

The accrual of interest on Part B claims of underpayments is neither a determination of entitlement to the Part B benefits themselves nor a determination of the amount of benefits due, even if finding for the plaintiffs would entail additional payments by the federal government. Those determinations were made respectively when plaintiffs submitted their claims originally and later in connection with the recalculation ordered by the court's 1988 final judgment. While the amount of interest due will naturally depend upon the amount of underpayments found after recalculation, deciding whether interest has in fact accrued is not itself a determination of the amount of benefits due to plaintiffs. Interest is not a Medicare benefit. Rather, it represents the time value of money lost by the plaintiffs awaiting benefits that should have been paid originally.

Finally, 42 U.S.C. § 1395ff(a), while applying the effective date of the 1986 amendment to "any other determination with respect to a claim for benefits under

part A," does not sweep so broadly with respect to Part B claims. It only extends to "any other determinations" under Part B to the extent they involve home health services. The accrual of interest does not fall within this category since the underlying services in this case involved operations performed at hospitals, not home health services. Therefore, the plaintiffs' interest claims do not fall within the purview of 42 U.S.C. § 1395ff or the jurisdictional limitations set by the effective date of its 1986 amendment.[4]

Two substantive issues remain for the court to address. First, was the court's earlier decision a "final determination" under 42 U.S.C. § 1395l (j) commencing the 30–day clock during which the Secretary may liquidate any underpayments due to the plaintiff class without owing accrued interest? Second, if a final determination was made, are plaintiffs, as direct beneficiaries who have not assigned their benefits, eligible to recover interest under the statute? If our final judgment is a final determination under 42 U.S.C. § 1395l (j), the 30–day clock has run and plaintiffs, if eligible to recover, would be owed the accrued interest. If no final determination was made, the Secretary, although still subject to our earlier recalculation order, would owe no interest at the present time.

At the outset, we note that interest can be recovered against the United States only where Congress expressly authorizes by law that it may be collected. *United States v. Louisiana*, 446 U.S. 253, 264–65, 100 S.Ct. 1618, 1625–26, 64 ·L.Ed.2d 196 (1980). In Medicare Part B cases, interest is authorized pursuant to 42 U.S.C. § 1395l (j). This statutory authorization, in essence a waiver of sovereign immunity, must be narrowly construed. *Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981).

---

**4.** The court further notes that while § 1395l (j) does not expressly state who has jurisdiction to make a final determination that an underpayment exists, the Secretary's implementing regulations governing the accrual of interest under § 1395l (j) implicitly recognize that courts have jurisdiction to review determinations regarding the accrual of interest. Revised regulations promulgated by the Secretary on July 22, 1991 provide that:

Except as required by any subsequent administrative or judicial reversal, interest accrues from the date of final determination as specified in this subsection.

42 C.F.R. § 405.376(c)(2).

Section 1395*l* (j) imposes two conditions on the recovery of interest against the United States for improper Medicare Part B reimbursements. First, a final determination must be made that the payments made were either overpayments or underpayments of the amounts properly due. Second, once a final determination is made, 30 days must pass without the overpayments or underpayments discovered being liquidated by the Secretary. 42 U.S.C. § 1395*l* (j).

Since the statute neglects to define "final determination," it remains unclear whether Congress intended to place authority for the issuing of final determinations solely in the hands of the agencies responsible for administering the Medicare Part B program or whether individuals may also seek a judicial final determination of underpayments. The court, however, does not confront this issue in a vacuum. The Secretary recently promulgated regulations on July 10, 1991 to clarify the meaning of this otherwise ambiguous term. These new regulations provide in part that:

> (c) *Definition of final determination.*
>
> (1) For the purposes of this section, any of the following constitutes a final determination:
>
> \*   \*   \*   \*   \*   \*
>
> (ii) In cases in which an NPR is not used as a notice of determination (that is, primarily under part B), one of the following determinations is issued—
>
> (A) A written determination that an overpayment exists and a written demand for payment;
>
> (B) A written determination of an underpayment; or
>
> (C) An Administrative Law Judge (ALJ) decision that reduces the amount of an overpayment below the amount that HCFA has already collected.

42 C.F.R. § 405.376(c)(1)(ii)(A), (B), (C). Plaintiffs read these regulations to implicitly define final determination as "any determination by a proper adjudicator (including an ALJ or a District Judge) that the amount paid was less than that due." Plaintiffs' Memorandum of Law for an Order Compelling Payment of Interest at 5.

This interpretation strikes the court as well beyond the bounds of the regulation's plain meaning. Subsections (A) and (C) expressly apply to cases involving overpayments of Part B benefits and are therefore irrelevant to the interest claims in this case which are based upon underpayments.

The question becomes whether or not this court's earlier judgment constitutes a "written determination of an underpayment," or in the words of 42 U.S.C. § 1395*l* (j), a written determination that the amount paid was less than the amount due. Section 405.376(c)(1)(ii)(B) fails to specify which entities can issue a written determination of a Part B underpayment and thereby trigger the statute's 30–day clock. In particular, no mention is made of the ability of courts to issue a final determination concerning underpayments. The Secretary's regulation, at least regarding underpayments, does little to clear away the ambiguity of the statute.

However, as defendants point out, comments by the agency accompanying the 1991 revised regulations plainly address this issue:

> The definition of final determination in § 405.376(c) applies to administrative, not judicial, determinations; therefore, there is no interest obligation under these regulations for judicial determinations.

56 Fed.Reg. 31335, July 10, 1991. According to the Secretary, a court decision, even one that expressly holds that an underpayment of Part B benefits has occurred, would not constitute a final determination that commences the accrual of interest. As we noted earlier, the revised regulations themselves, however, include a provision that implicitly recognizes a court's jurisdiction to review the agency's definition of final determination and the accrual of interest:

> Except as required by any subsequent administrative or judicial reversal, interest accrues from the date of final determination as specified in this subsection.

42 C.F.R. § 405.376(c)(2). There appears to be some tension between the Secretary's comments accompanying the 1991 regulations and the express language of the Sec-

retary's regulations themselves. If the court defers to HHS's interpretation, our earlier decision would not, and indeed, could not denote a final determination and plaintiffs would be entitled to no interest.

The court is mindful of the considerable deference due to an agency's interpretation of its own regulations. When confronting an agency's interpretation of an ambiguous statute that the agency is responsible for administering, the role of a reviewing court is not to impose its own construction of the statute but rather to judge whether the agency's interpretation is founded upon a permissible construction of the statute. *See Chevron, U.S.A., Inc. v. Natural Resource Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Moreover, due to the labyrinthine nature of the Social Security Act, Congress viewed deference to the Secretary's broad authority to interpret certain sections of the Act as particularly appropriate. *See Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 2639, 69 L.Ed.2d 460 (1981).

Despite the deference due to an agency's interpretation of its regulations, the court does not find that a blanket prohibition against courts rendering final determinations regarding Part B claims is a permissible construction of 42 U.S.C. § 1395*l* (j). Section 405.376(c)(2), a regulation recently promulgated by the Secretary, clearly envisions the possibility of courts reviewing interest claims under 42 U.S.C. § 1395*l* (j), including the agency's interpretation of the meaning of final determination.

Moreover, the Secretary's interpretation, set forth in the preamble's comments, clashes with the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986). This presumption can only be rebutted if the agency can show that Congress specifically intended to prohibit all judicial review. *Id.* at 673, 106 S.Ct. at 2137; *see also State of OR. O.B.O. OR. Health Sciences v. Bowen*, 854 F.2d 346, 350 (9th Cir.1988). Not only does 42 U.S.C. § 1395*l* (j)'s language fail to expressly pro-

hibit judicial review, but the plain meaning of the its implementing regulations foresees review of interest claims.

A total prohibition on jurisdiction to make final determinations would also undermine the basic purpose of the interest statute, encouraging parties to repay excess payments received for Medicare claims. If courts were unable to trigger the 30–day clock on interest accrual, Part B claimants might be exposed to unending agency delays in redressing underpayments without any recourse to judicial review. The Secretary could avoid making any final determinations on underpayments without paying the penalty Congress created to stop such delay tactics, interest accrual.

Indeed, long after the court's judgment in this case and the appellate court's affirmance, the Department of Health and Human Services is still unable to identify the subject claim in many states (these areas are classified as tiers III, IV, and V). *See* First Report of Special Master, *supra*.

This scenario, a logical extension of the Secretary's preamble comments, directly contradicts Congress' obvious policy motivating 42 U.S.C. § 1395*l* (j), encouragement of swift repayment of reimbursement deficiencies. A court "must reject administrative constructions of [a] statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *State of OR. O.B.O. OR. Health Sciences v. Bowen*, 854 F.2d, at 350 (quoting *Securities Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984)); *see also New York City Health and Hospitals Corp. v. Perales*, 954 F.2d 854, N.Y.L.J., Feb. 5, 1992 at 1, col. 3 (2nd Cir.1992) (New York's reductions in its state Medicare budget found contrary to goals of the Medicare Act). The Secretary's interpretation of "final determination" incorporated in the preamble comments to the revised 42 C.F.R. § 405.376, to the extent it prohibits courts from issuing

final determinations, is an impermissible construction of 42 U.S.C. § 1395*l* (j).[5]

■ We next address the question of whether this court's 1988 final judgment was in fact a final determination that an underpayment by the Secretary had occurred. The final judgment, entered on November 16, 1988, contained two key elements. First, in certifying the case as a class action, it defined the plaintiff class to include:

> All Medicare Part B assigned and unassigned claimants nationwide who have sought reimbursement for medical services provided between July 1, 1984 and April 30, 1986 by formerly salaried hospital-based physicians (who changed over to direct fee-for-service billing on or after November 1, 1982 and who provided the services after they changed to direct fee-for-service billing), and who were reimbursed on their claims at an amount less than they would have received under 42 U.S.C. § 1395u, had it not been for the combined effect of 42 C.F.R. § 405.551(e) and the freeze imposed by the Deficit Reduction Act of 1984.

Final Judgment, 85 Civ. 4772 (GLG) (S.D.N.Y. Nov. 16, 1988), at 2. This order clearly defined who was a member of the plaintiff class, namely those individuals who, because of the combined effect of the regulation and the budget freeze, were reimbursed in amounts less than the amounts due. to them.

Second, the judgment ordered the defendants to remedy the illegal effect of the HHS regulation and 1984 budget freeze by recalculating the customary charges for the class claims. This order was a direct outgrowth of the court's 1986 decision which held that the plaintiffs had been reimbursed, due to the combined effect of 42 C.F.R. § 405.551(e) and DEFRA, at "exceedingly low levels." *Cosgrove v. Bowen*, 649 F.Supp. at 1438. After holding the resulting reimbursement levels arbitrary and capricious, the court instructed the Sec-

retary to recalculate the customary charges as of July 1, 1984, giving effect to 42 C.F.R. § 405.551(e) but without regard for DEFRA. *Id.* at 1439 n. 13.

The import of this court's initial decision and the ensuing final judgment is clear. This court held that the combined interaction of 42 C.F.R. § 405.551(e) and DEFRA arbitrarily produced reimbursements that were less than the reimbursements the plaintiffs should have received. The recalculation ordered in the court's final judgment was based upon a clear determination of improperly low reimbursements.

The Second Circuit upheld this decision and similarly found that the setting of physicians' reimbursement rates at a small fraction of the rates for comparable services offered by other physicians was inequitable and unreasonable. *Cosgrove v. Bowen*, 898 F.2d at 334. In short, both courts determined that the interaction of 42 C.F.R. § 405.511(e) and DEFRA produced significant underreimbursements for the Part B claims of the plaintiff class. The only question that remains is whether the details omitted, or unavailable, at the time of the final judgment make the judgment sufficiently indefinite to prevent the court from viewing it as a final determination.

Defendants argue that the 1988 judgment could not have determined with finality that an underpayment occurred because the court lacked necessary information regarding the deductibles of beneficiaries and the amounts of the actual charges, the recalculated customary charges, and the prevailing charges. Defendants are correct that the 1988 final judgment did not, indeed since such information was not yet available, could not specify the dollar amounts that individual beneficiaries were entitled to receive to correct their underpayments. However, by assuming that a final determination under 42 U.S.C. § 1395*l* (j) requires an assessment of the precise amounts owed to each beneficiary before

---

**5.** The court also views with suspicion the recent adoption of these regulations with the preamble's blanket rejection of a court's power issue final determinations under § 1395*l* (j). The timing of the regulation's adoption smacks of a blatant attempt to preempt, or at least influence, the outcome of this nationwide class action by exploiting the court's usual deference to an agency's interpretation of a statute it is charged with administering.

interest can accrue, defendants misconstrue the statute.

Section 1395*l* (j) plainly does not require a final determination to include such detailed information. The statute only requires that, whenever a final determination is made that an underpayment has taken place, interest shall accrue if the underpayment is not liquidated within 30 days. The statute does not state that the number of claimants must be specified or that the amount of each claim must first be calculated. The recalculation ordered by the court was intended to settle these issues. The 30–day clock for interest accrual was designed to insure that these details were settled expeditiously. To further speed their resolution, the court order provided specific guidance to the Secretary concerning who was eligible for the recalculation, the formula for recalculation, and the percentage of the underpayments to be paid to the plaintiffs.

Defendants stress that the court's final judgment could not be considered a final determination of an underpayment because the recalculation order was phrased in the conditional. The final judgment ordered the Secretary to pay 80% of *"any resulting* increase in such reasonable charges found by the carriers to be due to the appropriate claimants." Final Judgment, No. 85 Civ. 4472 GLG (S.D.N.Y. Nov. 16, 1988) (emphasis added), at 2. Defendants argue that this language demonstrates that the court had not in fact made a final determination that any underpayments existed but merely ordered defendants to pay 80% of the underpayments, if any, that were discovered through the recalculation.

Defendants, however, mistakenly view the meaning of the court's order. After the court held that the combined effect of § 42 C.F.R. § 405.551(e) and DEFRA underreimbursed the plaintiff class, the major issue remaining was the actual amounts that were owed to each individual member of the class. In ordering the recalculation, the court simply specified the formula to be used for paying the amounts due to the plaintiffs. Consequently, instead of revisiting the holding of its 1986 decision that underpayments had taken place, the court addressed the actual amounts that would be paid to each plaintiff upon recalculation.

Defendants, however, rely upon *Community Hospital of Santa Rosa v. Sullivan,* No. C–90–0972–RFP (N.D.Cal. Apr. 15, 1991), 1991 WL 191250, and *National Medical Enterprises, Inc. v. Bowen,* No. CV 89–5165 WDK (Sx) (C.D.Cal. July 5, 1990), 1990 WL 169276, for the proposition that a final determination only occurs once a provider has received notification of the actual amount of the underpayment. Defendants' Memorandum of Law in Opposition to Plaintiff's Request for Interest at 9–10. We agree with defendants that, although these cases concern Part A interest claims, they are relevant to this Part B interest claim since the language of 42 U.S.C. § 1395g(d) addressing interest on Part A claims is nearly identical to the provisions of 42 U.S.C. § 1395*l* (j).[6]

In *Santa Rosa,* the court clearly held that no final determination could have been reached concerning the amounts due to the plaintiff under Part A for fiscal year 1985 until after the United States Court of Appeals for the District of Columbia had handed down its decision in *Georgetown University v. Bowen,* 862 F.2d 323

**6.** As defendants noted, the sole difference between § 1395*l* (j) covering interest on Part B claims and § 1395g(d) covering interest on Part A claims is that § 1395*l* (j) includes an additional provision making it applicable to payments made on the basis of an assignment of charges for services as well. Section 1395*l* (j) provides:

Whenever a final determination is made that the amount of payment made under this part either to a provider of services *or to another person pursuant to an assignment under section 1395u(b)(3)(B)(ii)* was in excess of or less than the amount of payment that is due, and

payment of such excess or deficit is not made (or effected by offset) within 30 days of the date of the determination, interest shall accrue on the balance of such excess or deficit not paid or offset (to the extent that the balance is owed by or owing to the provider) at a rate determined in accordance with the regulations of the Secretary of the Treasury applicable to charges for late payments.

42 U.S.C. § 1395*l* (j) (emphasis added). Only the highlighted portion of § 1395*l* (j) is absent from § 1395g(d), the provision covering interest for Part A claims.

(D.C.Cir.1988). *See Community Hospital of Santa Rosa v. Sullivan*, No. C–90–0972–RFP (N.D.Cal. Apr. 15, 1991), at 11–12, 1991 WL 191250. Since the *Georgetown* decision impacted the finality of the determination by invalidating a determinative factor in the underlying regulation, the earlier district court decision could not have been a final determination.[7]

When this court certified the plaintiff class and ordered the Secretary to recalculate reasonable charges that it had determined were "exceedingly low," there was no decision pending before the Court of Appeals that would have directly impacted the finality of its Final Judgment. Indeed, the Second Circuit affirmed this court's initial decision to strike down the continued application of 42 C.F.R. § 405.551(e) and DEFRA and order a recalculation of the physicians' reasonable charges. *Cosgrove v. Bowen*, 898 F.2d at 334.

The court's decision in *National Medical Enterprises, Inc. v. Bowen*, No. CV 89–5165 WDK (Sx) (C.D.Cal. July 5, 1990), 1990 WL 169276, although addressing the issue of what constitutes a final determination, also not dispositive in the present case. In *National Medical*, the court relied upon its deference to the Secretary's regulations in the face of the statute's ambiguity to deny the plaintiff's claim for interest. *See id.* at 12. In cases in which a Notice of Program Reimbursement ("NPR") is issued, the regulations clarified the statute's ambiguity by stating that a final determination for purposes of interest accrual is marked by the date of the NPR's issuance. The court held that the Secretary's clear definition was reasonable and did not conflict with Congress' intent expressed in the statute.

In the present case, 42 C.F.R. § 405.376(c)(1)(C) defines a final determination in cases in which no NPR is issued—*i.e.* primarily Part B claims—as "a written determination of an underpayment." The Secretary's regulation is nearly as ambiguous with respect to underpayments as the stat-ute it purports to clarify. Moreover, the Secretary's explanatory comments in the regulation's preamble excluding judicial determinations are contrary to Congress' intent. As we noted in our discussion of jurisdiction, Congress signaled its intent that interest claims should be subject to judicial review.

More importantly, to accept defendants' position would emasculate the animating intent of 42 U.S.C. § 1395*l* (j). The statute was created to spur the government and Medicare claimants to quickly liquidate amounts owed due to underpayments or overpayments. As defendants point out, the Secretary also intended the regulations implementing 42 U.S.C. § 1395*l* (j) to encourage parties to promptly repay the excess amounts they improperly received. *See* 47 Fed.Reg. 54814, December 6, 1982. Accepting the Secretary's position would allow defendants to pile delay upon delay in recalculating the customary charges. Defendants could effectively thwart the basic purpose in authorizing interest accrual, namely using monetary incentives to spur speedy correction of underpayments or overpayments.

Notably, the court in *National Medical* specifically rejected the Secretary's contention that 42 U.S.C. § 1395g(d) required a final determination of the amount of the underpayment owed for Part A services before interest could accrue. The statute "merely requires a determination that there was a miscalculation; it does not require a recalculation as part of the final decision." *National Medical, supra,* at 12. As defendants stress, although 42 U.S.C. § 1395g(d) covers Part A claims, the language is virtually identical to 42 U.S.C. § 1395*l* (j) and the court's reasoning is equally applicable. Significantly, the court also rejected the Secretary's claim that it lacked jurisdiction to hear the plaintiff's claim for interest. *See id.* at 8–9.

Five years have passed since the court invalidated the combined application of 42

---

**7.** The determination of the amounts due to the plaintiff in the *Santa Rosa* case turned on the applicability of the best data exception to the prospective payment rule. Until the D.C. Cir-cuit, in *Georgetown University v. Bowen,* decided whether the exception applied to the plaintiff, no final determination could have been made concerning plaintiff's Part A claims.

C.F.R. § 405.551(e) and DEFRA; a full three years have passed since the court issued its final judgment. The plaintiff class consists of Medicare Part B beneficiaries many of whom are elderly citizens who can ill afford to wait indefinitely for the Secretary to complete the recalculations. This is precisely the sort of agency procrastination that the interest provisions are designed to discourage.[8]

Awarding the plaintiffs interest on their Part B underpayments works no injustice against the defendants. Plaintiffs were compelled to force the Secretary into federal court in order to receive payments that were arbitrarily withheld from them. Awarding them interest penalizes the Secretary for delays and provides them with the time value of money they lost while waiting for the defendants to recalculate customary charges and reimburse them the amounts they should have received but for the combined application of 42 C.F.R. § 405.551(e) and DEFRA. Even if recalculating the customary charges for the class by definition requires more than 30 days due to the sheer size of the class, the statute still serves to encourage the defendants to complete this task expeditiously so as to minimize the interest accrual.

Consequently, we find that our 1988 final judgment, viewed in conjunction with the 1986 decision it implemented, was clearly a written final determination that underpayments to the plaintiffs had taken place. Yet, in order for the plaintiffs to be entitled to collect interest on the unliquidated underpayments, it must be determined whether Medicare beneficiaries with unassigned claims are eligible to recover the interest under the statute.

■ Defendants argue that 42 U.S.C. § 1395*l* (j) expressly precludes those plaintiffs who are beneficiaries holding unassigned Part B claims from recovering any interest on unliquidated underpayments. The statute authorizes interest to accrue beginning 30 days after a final determination that underpayments were made to providers of services or to other persons pursuant to an assignment of the beneficiaries' rights to reimbursements. Defendants conclude that since some of the plaintiffs are neither providers nor assignees and waivers of sovereign immunity must be interpreted narrowly, those plaintiffs are not entitled to recover interest under 42 U.S.C. § 1395*l* (j).

Plaintiffs admit that the language of 42 U.S.C. § 1395*l* (j) contains no explicit recognition of the rights of direct Medicare beneficiaries with Part B claims to receive interest. They argue, however, that no rational basis exists to distinguish between physicians who were underpaid and beneficiaries who were billed directly and were subsequently underreimbursed. Plaintiffs also argue that payment arrangements between physicians and patients should not form the basis for denying plaintiffs the ability to recover interest. These plaintiffs contend that their rights to collect interest are derivative from the provider's express right to recover interest under 42 U.S.C. § 1395*l* (j).

Lastly, plaintiffs argue that even if the court determines that those plaintiffs who are Medicare beneficiaries with unassigned claims have no entitlement to interest under 42 U.S.C. § 1395*l* (j)'s terms, interest is nonetheless due to all physicians who submitted assigned claims and were underpaid.

Section 1395*l* (j) expressly states that interest accrues on final determinations made concerning "the amount of payment made under this part either to a provider of services and to another person pursuant to an assignment under section 1395u(b)(3)(B)(ii)." 42 U.S.C. § 1395*l* (j). The court recognizes that this interest provision, being a waiver of sovereign immuni-

**8.** Agency delays in assessing underpayments and issuing final determinations also appear less problematic for Part A claims than they are for Part B claims. As the court in *National Medical Enterprises, Inc. v. Bowen* noted, the issuance of an NPR represents a final determination for Part A claims. The governing regulations limit the time an intermediary has in which to issue an NPR. Failure to issue an NPR within a "reasonable time," 12 months being the maximum, is grounds for an appeal to the Board. *See National Medical Enterprises, Inc. v. Bowen,* No. CV 89–5165 WDK (Sx) (C.D.Cal. July 5, 1990), at 14 n. 2, 1990 WL 169276.

ty by the federal government, must be construed narrowly. Plaintiffs admit that certain members of the class are neither providers of services nor holders of assigned claims. Therefore, those plaintiffs who are beneficiaries with unassigned claims fall outside the confines of the statute.

Plaintiffs, however, contend that the statute's distinction between providers and assignees who are eligible to recover interest and beneficiaries who were billed and reimbursed directly for Part B claims by their health care providers yet are not eligible to recover interest would violate the equal protection guarantees of the United States Constitution. While the plaintiffs raised the issue only in passing and the defendants ignore it altogether, the court will not treat the equal protection issue in such a cursory manner.

When challenging economic or social welfare legislation such as the Social Security Act on equal protection grounds, the scope of judicial review is extremely narrow. A court "properly exercises only a limited review power over Congress, the appropriate representative body through which the public makes democratic choices among alternative solutions to social and economic problems." *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981).

Since the distinction between beneficiaries and providers does not involve fundamental personal rights or inherently suspect classifications such as race or religion, the statute is presumed constitutional and a court must "require only that the classification challenged be rationally related to a legitimate [governmental] interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). In applying this standard of review, the court notes that:

"[a]s long as the classificatory scheme chosen by Congress rationally advances a reasonable and identifiable government objective, we must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred."

*Schweiker v. Wilson*, 450 U.S. at 235, 101 S.Ct. at 1083.

While the legislative history of 42 U.S.C. § 1395*l* (j) is limited at best, the intent behind the interest accrual provision may be gleaned from congressional explanations of the interest provision ultimately incorporated into Pub.L. 97–248. Before § 117 of TEFRA was enacted, providers and suppliers of services who received overpayments from the Medicare program were charged no interest on reimbursements during the period for which the reimbursements were made nor were they paid any interest on underpayments.

Congress believed that the absence of interest charges encouraged providers and suppliers of services to place of low priority on the repayment of their debts. *See* STAFF OF HOUSE COMM. ON WAYS AND MEANS, 97th CONG., 2D SESS., EXPLANATION OF H.R. 6878 (Comm. Print 1982) [hereinafter STAFF EXPLANATION OF H.R. 6878], at 38–39.[9]

Clearly Congress regarded the overpayment of providers and their subsequent delays in repaying their debts as a primary budgetary concern. In its report accompanying H.R. 6878, the staff of the House Way and Means Committee estimated that requiring interest to be paid on overpayments to providers would produce a budget savings of 20 to 25 million dollars over a five-year period. *See* STAFF EXPLANATION OF H.R. 6878, at 88. Hence, it chose to enact an interest accrual statute to encourage through monetary penalties

---

**9.** This explanation by the staff of the House Committee for Ways and Means accompanied the introduction of H.R. 6878, a Medicare reform bill that included an interest accrual provision for Part B claims identical to the interest accrual provision included within H.R. 4961, the bill that was ultimately enacted as 97 P.L. 248. When H.R. 4961 was sent to conference to resolve differences between the House and Senate over Senate amendments to the bill, further formal action on H.R. 6878 became unnecessary. While it was H.R. 4961 that eventually became law, the legislative intent expressed in the staff explanation of H.R. 6878's interest provision remains forceful.

the speedy repayment of amounts received by providers as overpayments.

While the court may be equally troubled by delays on the part of the federal government in repaying deficiencies associated with underpayments to individual Medicare beneficiaries, it may not simply superimpose these concerns upon the legislature's judgment by amending its statutes. Congress' concern, as expressed by the Chairman of the House Ways and Means Committee when H.R. 4961, the bill that included the interest accrual provision, was sent to conference, was to conform to "the overwhelming desire of Members on both sides of the aisle to make reductions in as compassionate a way as possible with the least impact on beneficiaries particularly in the medicare program." STAFF EXPLANATION OF H.R. 6878, at 1.

In excluding beneficiaries from 42 U.S.C. § 1395*l* (j), Congress chose a tradeoff. While beneficiaries are not entitled to recover interest on underpayments, they are concurrently exempted from owing any interest on overpayments they receive. To reduce the budget deficit while avoiding the creation of any added burdens on Medicare beneficiaries who might lack the steady stream of income from which to easily repay any overpayments and interest owed, Congress targeted Medicare providers and suppliers. The court is not prepared to tamper with these legitimate congressional policy choices for Medicare. Therefore, the court finds that beneficiaries holding unassigned Part B claims are not entitled to collect interest under 42 U.S.C. § 1395*l* (j).

III. CONCLUSION

For the reasons stated above, the court concludes that the 1988 final judgment, viewed in conjunction with the court's decision in *Cosgrove v. Bowen,* 649 F.Supp. 1433 (1986), represented a final determination that underpayments had occurred. The plaintiffs' order to compel the payment of interest is granted only to the extent that interest, accruing since the date of the court's final judgment, shall be paid to all providers and persons holding assigned

claims under 42 U.S.C. § 1395u(b)(3)(B)(ii) on behalf of plaintiffs and were underreimbursed due to the combined impact of 42 C.F.R. § 405.551(e) and DEFRA. The court also reemphasizes that the Secretary must complete the recalculations ordered three years ago without any further delay.

SO ORDERED.