**THE DALLES IRRIGATION DISTRICT, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 05–1042C.

United States Court of Federal Claims.

Aug. 21, 2009.

602

Arden E. Shenker, Shenker & Bonaparte, LLP, Portland, Oregon.

Armando A. Rodriguez–Feo, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. Of counsel was Clark Miller, Attorney–Advisor, Field Solicitor's Office, U.S. Department of the Interior, Boise, Idaho.

## OPINION AND ORDER

LETTOW, Judge.

This post-trial decision addresses damages for breach of a contract between The Dalles Irrigation District ("The Dalles" or "District") and the United States Department of the Interior, Bureau of Reclamation ("Bureau"), under which the Bureau was obligated to supply the District with hydroelectric power for irrigation pumping. The District has claimed that the government contravened the contract by overcharging for energy and seeks damages of ·approximately $8,000,000.

As stipulated by the parties, trial of liability and of damages was bifurcated. Based upon evidence adduced in the trial of liability, the court found that the Bureau had breached its contract with the District to the extent that it had wrongfully included a "lost revenue component" in the rates charged to the District for irrigation pumping power. *See Dalles Irrigation Dist. v. United States*, 82 Fed.Cl. 346, 366–67 (2008) (*"Dalles II"*).

Thereafter, a trial on damages was held to determine what damages, if any, the District was entitled to as a result of the inclusion of the lost revenue component. Post-trial briefing has concluded and closing arguments were heard on July 27, 2009. The case is ready for disposition.

## PROCEDURAL POSTURE

The Dalles initially filed its complaint in the United States District Court for the District of Oregon on August 18, 2004. The case was subsequently transferred to this court in light of the Supreme Court's ruling in *Orff v. United States*, 545 U.S. 596, 125 S.Ct. 2606, 162 L.Ed.2d 544 (2005), and was docketed here on September 28, 2005. *See Dalles Irrigation Dist. v. United States*, 71 Fed.Cl. 344, 345, 349 (2006) (*"Dalles I"*).[1]

In this court, the government filed a motion to dismiss for lack of subject matter jurisdiction, averring that relief was barred under the six-year statute of limitations set out at 28 U.S.C. § 2501. That motion was denied based on the continuing claims doctrine. In an opinion issued on June 19, 2006, the court held that The Dalles was entitled to seek damages for claims dating back to August 18, 1998, six years prior to the filing of the original complaint in the district court. *Dalles I*, 71 Fed.Cl. at 353. Although the court held that The Dalles could not seek relief respecting claims that occurred prior to August 18, 1998 because the statute of limitations had already run on those claims, The Dalles was entitled to "support its post-August 1998 claims by using earlier events as 'background evidence.'" *Id.* at 355 (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

---

1. By statute, the United States has explicitly waived sovereign immunity in cases where a party seeks to "join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law." 43 U.S.C. § 390uu (stating that suits under this Section "may be brought in any United States district court in the State in which the land involved is situated"). However, after this case was filed in federal district court, the Supreme Court in *Orff* held that Section 390uu is limited to cases where the United States is joined as a party defendant in an action between third parties and that Section 390uu does not waive the government's sovereign "immunity from suits directly against the United States." *Orff*, 545 U.S. at 604, 125 S.Ct. 2606. Consequently, The Dalles could no longer pursue its case in the district court under Section 390uu, and the District successfully sought to have the case transferred to this court such that it could proceed under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See* Hr'g Tr. 25:22 to 26:23 (May 9, 2006).

Trial on liability was held from November 13 through 16, 2007, in Portland, Oregon. *Dalles II*, 82 Fed.Cl. at 347. Following post-trial briefing and closing argument, the court issued its decision finding liability only regarding the Bureau's inclusion of a "lost revenue component" in the reserved-power rate charged the District. *Id.* at 364–65. The court found that this lost revenue component, which had been charged to the District beginning in 1990, included "[t]he difference between the actual cost of service and the revenue collected from the charge in effect for the previous five-year period" along with "project inflation (*i.e.*, the difference between the historical cost of service and the projected cost of service in a given year)." *Id.* at 364 (citing DX 8 at 18 (Revision No. 1 to Memorandum of Understanding ("MOU") between the Bonneville Power Administration and the Bureau (effective Jan. 1, 1990)) ("Revision No. 1 to MOU") (internal quotation marks omitted)).[2] The Bureau added an interest rate to the lost revenue charges assessed to the District, calculating this rate based on the actual long-term interest rate for the previous five years and the anticipated project cost for the forthcoming five years. *Id.* (citing DX 8 at 19 (Revision No. 1 to MOU)). The government argued that the lost revenue component did not contravene the contract because it simply served as a "true-up" mechanism to ensure that the power rate it charged to the District accurately reflected the actual and anticipated future costs of power generation. *See id.* at 364–65. The court rejected these arguments, concluding that the lost revenue component ran afoul of the contract both by improperly including interest as a cost to the District and by circumventing the limitation that the Secretary make rate changes no more frequently than once every five years. *Id.* (noting that the "reserved power" rates charged to The Dalles "were not to include interest, and they were to be set in five-year incremental cycles"). Accordingly, because the lost revenue component was found to be contrary to law,

the government was held liable to the District for the portion of the charges at issue reflecting that component. *See id.*

In other respects, the court found that the rate charged by the Bureau to the District properly included (i) costs for operation and maintenance of facilities for power production at the dam, reservoir, and power plant, (ii) fish and wildlife costs allocated to power production at the dam and reservoir, and (iii) depreciation costs associated with power-producing facilities at the dam. *Dalles II*, 82 Fed.Cl. at 366. Accordingly, the District could not recover on its claims for these charges. *See id.*

Trial on damages was held from April 22 to 23, 2009 in Portland, Oregon, focusing on inclusion of the lost revenue component in the rates charged by the Bureau to the District since August 18, 1998. At trial, however, the parties also raised ancillary issues that they contended affected the calculation of damages. The government averred that actual costs of producing power on a year-by-year basis exceeded the rate charged the District on a net basis during the years since 1998, and that the actual costs should be taken into account, effectively reducing to zero any recovery by the District. The District sought to revisit the court's earlier decision that depreciation of power-generating facilities was properly taken into account by the government in setting the rate for power payable by the District. The District also contended that it should be refunded amounts charged by the Bureau in excess of its costs during the first thirty years of the contract, when those charges substantially exceeded the actual cost of power production.

**FACTS[3]**

*A. Contract and Post–Contractual Implementation*

The Dalles Dam was completed in 1957, and in 1960 Congress authorized The Dalles

2. Citations to the transcript of the trial for liability are to "Liab. Tr. ___," to the transcript of the trial for damages are to "Damages Tr. ___," and to the transcript of the closing arguments on damages are to "Cl. Tr. ___." Plaintiffs' exhibits are denoted as "PX" and defendant's exhibits are

denoted as "DX." The government's demonstrative exhibits are designated "DDX."

3. This recitation of facts is drawn both from the evidentiary record of the damages trial and from the evidentiary record of the liability trial as

Irrigation Project by a separate enactment from the authorization for the Dam. *See* Act of Sept. 13, 1960, Pub.L. No. 86–745, 74 Stat. 882. The contract at issue was entered in 1961 to implement the legislation authorizing the irrigation project, and under its provisions, the Bureau agreed to provide The Dalles with hydroelectrically generated power for irrigation pumping purposes. DX 6 (Contract No. 14–06–100–2276, captioned "Repayment Contract Between the United States of America and The Dalles Irrigation District" (Oct. 19, 1961) ("Contract")). The power was to be generated by the hydroelectric power plant associated with The Dalles Dam on the Columbia River, and the District agreed to pay, among other charges, rates for irrigation pumping power based upon those costs of the dam, reservoir, and power plant that were allocable to power production. *Id.* at 12–13 (Contract § 14(a)). Initially, the rate that the parties deemed to be "sufficient to cover the costs of such power and energy" was fixed in the Contract at one mill per kilowatt-hour ("mill/kWh"). *Id.* at 13 (Contract § 14(a)). The Contract provided that this rate would be effective until the Secretary determined that a different rate should be applied. *Id.* The contract further specified that any such changes by the Secretary to the reserved-power rate "shall not be made more frequently than once in any five-year period." *Id.* The Contract states that "[t]he [Bureau]'s determination as to what cost is properly chargeable under this contract, and the classification of those charges for repayment purposes, shall be conclusive." *Id.* at 17 (Contract § 18(b)).

The costs to the Bureau of providing the District with power were to be set forth in annual statements furnished by the Bureau "each year on or before February 1 of the calendar year for which it is to be applicable." DX 6 at 13 (Contract § 14(b)). In turn, The Dalles was obligated to make pay-

ments in accord with such estimates on or before April 1 of each year. *Id.* Then, at the conclusion of the year, the Bureau would issue a final statement to the District reflecting actual power used and the established rate for the period, calling for additional payments or refunds depending on how the finally stated amount compared to the estimate. *Id.*

The facilities of The Dalles Irrigation Project (the "Project") are located immediately adjacent to The Dalles Dam, and under the Contract, the District was obligated to repay the Bureau for the capital costs of the Project over a fifty-year period. *Dalles II*, 82 Fed.Cl. at 349. From the outset of the Contract, the Bureau declined to include the costs of transmitting power from The Dalles Dam to the District in the rates it charged the District for hydroelectric power. *See id.* at 352 (citing PX 40 at BPA 248 (Letter from Neil Stessman, Regional Supervisor, Bureau, to L.W. Lloyd, Regional Director, Bureau (Sept. 1, 1982))). In 1979, the Bonneville Power Administration ("BPA"), a self-financed governmental agency that serves as the power marketing agency for the Pacific Northwest federal hydroelectric power system, attempted to add transmission costs to the operation, maintenance, and replacement costs allocated to the Bureau and then to the District. *See* PX 31 at BPA 1041–42 (Summary prepared by Susan Garifo, Manager of Sales Administration for Transmission for BPA ("Garifo Summary")).[4] The District resisted that modification to the terms of performance under the contract, and the Bureau thereafter concluded that the transmission costs should continue to be excluded from the costs of power and energy charged to the District. *See Dalles II*, 82 Fed.Cl. at 353 (noting that "the rate was not increased, and The Dalles continued to pay for power and energy at a rate of 1.0 mill/kWh"). Conse-

reflected in *Dalles II*, 82 Fed.Cl. 346. This recitation constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

**4.** As described in the prior opinions in this case, three federal agencies are involved with the oper-

ation of The Dalles Dam and the provision of hydroelectrically generated power from the Dam to the District. The Corps of Engineers operates the Dam and power plant. BPA markets power from the Dam, and the Bureau is responsible for the irrigation aspects of the project and for the provision of power to the District in that connection. *See Dalles II*, 82 Fed.Cl. at 347–50.

quently, at the liability phase of this case, the court determined that transmission costs "have no bearing on the costs of power and energy associated with the dam, reservoir, and powerplant." *Id.* at 364.

In addition, as established during the trial of liability, the rates charged to The Dalles were intended by Congress to be set on the basis of interest-free financing. *See Dalles II,* 82 Fed.Cl. at 365 (citing H.R. Doc. No. 431 (June 22, 1960) (report on The Dalles Irrigation Project); PX 36 (Mem. from Commissioner, Bureau, to Secretary of the Interior (Aug. 30, 1961)); PX 31 at BPA 1040 (Garifo Summary)). From the commencement of implementation of the Contract, the estimate of power costs at 1 mill/kWh was set "on the basis of interest-free financing." PX 31 at BPA 1040 (Garifo Summary). BPA continues to this day to charge "no interest expense on federal investment ... to the irrigation district." Liab. Tr. 750:2–5 (Test. of Jerry Dinan, a former accountant for BPA). Interest is thus not an element of the power and energy costs that can be charged to the District. *See Dalles II,* 82 Fed.Cl. at 365.

### B. Inclusion of the Lost Revenue Component

In the late 1980s, the Bureau began to work with BPA to establish a new methodology for determining rates for power provided to The Dalles and other small irrigation projects. *See* PX 7 at BPA 1132–33 (Mem. from Commissioner, Bureau, to Assistant Secretary, Water and Science, Interior (Sept. 28, 1990)). Following negotiations between BPA and the Bureau, a lost revenue component was added to the charges assessed to the District. *See* PX 31 at BPA 1042 (Garifo Summary). As a result of this additional charge, the rate assessed to The Dalles for irrigation pumping power was increased from 1 mill/kWh to 1.23 mills/kWh for the 1990 to 1994 period. *Id.* This rate was calculated by taking the historical cost of providing power from 1985 to 1988, which was determined to be 1.160 mills/kWh, and adding to that an amount to compensate BPA for "lost revenue," determined to be 0.067 mill/kWh. DX 8 at 18–21 (Revision No. 1 to MOU) (effective Jan. 1, 1990).

Subsequently, in 1995, BPA recalculated the historical cost of generating power from 1990 to 1993 at 1.226 mills/kWh, and, by adding to that amount a lost revenue charge of 0.086 mill/kWh, determined that the rate to be assessed to The Dalles for the ensuing five-year period would be 1.31 mills/kWh. DX 8 at 25–28 (Revision No. 2 to MOU between BPA and Bureau (effective Jan. 1, 1995) ("Revision No. 2")); PX 93 at 1–4 (Revision No. 2 to Charge and Calculations, The Dalles Project (effective Jan. 1, 1995)). In 2002, the energy and power rate assessed to The Dalles was increased to 2.59 mills/kWh, based upon a historical power-generation cost of 1.846 mills/kWh from 1994 through 2000 and an upward adjustment of 0.748 mills/kWh for lost revenue. DX 8 at 29–32 (Revision No. 3 to MOU between BPA and Bureau) (effective Jan. 1, 2002) ("Revision No. 3 to MOU"); PX 93 at 6–10 (Revision No. 3 to Charge and Calculations, The Dalles Project (effective Jan. 1, 2002)). Finally, in 2007, the rate assessed to The Dalles for the ensuing five-year period was increased to 5.06 mills/kWh. DX 8 at 33 (Revision No. 4 to MOU between BPA and Bureau) (effective Jan. 1, 2007); PX 99 at 2 (Report of Carol Opatrny, The Dalles' expert on economic damages, entitled "Lost Revenue Components Surplus Payments Carryover" (Jan. 9, 2009) ("Opatrny Report")).

### STANDARDS FOR DECISION

It is a fundamental principle of contract law that "[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Mich. Power Co. v. United States,* 422 F.3d 1369, 1373 (Fed. Cir.2005) (citing *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1562 (Fed.Cir.1997)); *see White v. Delta Constr. Int'l, Inc.,* 285 F.3d 1040, 1043 (Fed.Cir.2002). Correlatively, the injured party "should not be placed in a better position through the award of damages than if there had been no breach." *Bluebonnet Sav. Bank, F.S.B. v. United States,* 339 F.3d 1341, 1345 (Fed.Cir.2003).

■ To recover damages based on the government's wrongful inclusion of a lost revenue component in the rates charged for irrigation pumping power, The Dalles must show that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Mich. Power Co.*, 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed.Cir. 2002)).

## ANALYSIS

The District urges the court to consider three issues regarding damages:

1. What is the amount of the lost revenue component which must be backed out of the charges made to the Irrigation District?

2. What is the amount of the surplus properly to have been credited to the Irrigation District by the Bureau of Reclamation over the years, properly accumulated and passed along from year to year?

3. What is the amount of depreciation which has been charged to the District and should be backed out of the total amount billed to the District?

Pl.'s Post–Trial Damages Br. at 3 ("Pl.'s Br."). The District additionally argues that its damages regarding the lost revenue component, historical overcharges, and depreciation costs should all be measured by adding compound interest, as computed through 2009, to the original nominal-dollar amounts of those damages. *Id.* at 9–11. The District characterizes this total sum as the "present value" of the damages to which it is entitled. *See id.* The government objects both to the District's proffered grounds for damages and to the District's suggested present-value computation, arguing that any potential damages awarded to the District should simply be paid in nominal dollars, without compound interest. Def.'s Post–Trial Damages Brief at 3–4, 18 ("Def.'s Br."). Overall, the government contends that the District, at trial, "failed to articulate how it suffered any damages as a result of the inclusion of the lost revenue component from 1998 forward." *Id.* at 3.

### A. Scope of Damages

■ In a claim for damages based on a partial breach of a contract, an injured claimant "may recover damages for nonperformance only to the time of trial." *Indiana Mich. Power Co.*, 422 F.3d at 1376 (citation omitted). Due to their speculative nature, prospective damages for anticipated *future* nonperformance of a contract may not be recovered even if they "result[ ] from the same partial breach" that gave rise to the past damages. *Id.* In the present litigation, it was established at the trial of liability that the Bureau was in breach of its repayment contract with The Dalles with respect to the inclusion of a lost revenue component in the rates charged to the District. *See Dalles II*, 82 Fed.Cl. at 364–65. Accordingly, the damages under consideration in this case include those that were incurred within the six-year statute of limitations prior to the filing of the District's complaint, and potentially those that were incurred between the filing of the complaint and the conclusion of the trial for damages.

■ Ordinarily, in a contract case involving a partial breach, a plaintiff's damages are "limited to those costs [or losses] incurred prior to the date of suit." *Indiana Mich. Power Co.*, 422 F.3d at 1376–77. However, under RCFC 15(b), when parties try an issue by mutual consent, the court may and at times must treat the issue as if it had been raised in the pleadings. Here, during the trial on damages in this case, the parties submitted filings and proofs of damages that were calibrated to account for events through the final day of the trial, April 23, 2009; hence, the parties effectively tried the issue of damages by mutual consent through that date. *See Tennessee Valley Auth. v. United States*, 69 Fed.Cl. 515, 523–24 (2006) (treating plaintiff's complaint as having been amended under RCFC 15(b) to include claims for damages through the date to which parties' supplemental filings and proofs of damages were calibrated). Consequently, the District's complaint is deemed amended to address damages incurred from

August 18, 1998 through April 23, 2009. *See* RCFC 15(b); *Tennessee Valley Auth.*, 69 Fed.Cl. at 523–24.

### B. Lost Revenue Component

The government acknowledges that the "real issue," as established in the opinion on liability, "is that the actual costs [*sic*—rather, rates] that were provided to [the District] contained elements that [the District] should not have had to pay for." Cl. Tr. 17:3–6. The contested element is the lost revenue component that was wrongfully included in the rates charged to the District from 1998 to 2009. The government raises two primary objections to the recovery of damages based on the inclusion of the lost revenue component. First, the government argues that during the relevant period, the District has underpaid the government for the power it has received and thus that any award of money damages to the District "would be contrary to the plain language of the repayment contract and would provide the District with a windfall." Def.'s Br. at 3–4. Second, and alternatively, the government attempts to split the interest aspect of the lost revenue component, which it concedes to be impermissible, from the other portions of the lost revenue component, some of which would have been permissible for incorporation in the rate. *Id.* at 11–12.

The government acknowledges that the total amount paid by the District from August 1998 through 2008 as a result of the lost revenue component is $162,055. Def.'s Br. at 9–10 (citing Damages Tr. 96:25 to 97:2 (Opatrny); PX 98 at 4 (Opatrny Report)). The government nonetheless contends that the court should put aside the rate established by the Bureau on five-year cycles and focus on the government's actual cost of generating power on a year-by-year basis over that period. On that basis, the government objects to the District's recovery of the lost revenue component on grounds that "the District did not pay the actual costs of the power furnished to it by the [g]overnment since 1998." Def.'s Br. at 10. For the proposition that the

costs of furnishing power to the District exceeded the payments made by the District, the government cites evidence demonstrating that the total costs of operation, maintenance, and depreciation associated with the provision of power and energy to the District from 1998 to 2007 were $467,122, and that the District paid $418,887 to the Bureau during those years. *See* Def.'s Br. at 6–9 (citing DDX 5 (Comparison of Payments by the District with Government's Power Costs, 1998–2007), DX 8 at 30 (Revision No. 3 to MOU), DX 17 at 3–17 (Notice of Pumping Power Charges from 1998 to 2007), DX 25 at 1 (Pumping Power Charges in 2002), DX 29 at 6 (Report of Dr. William Eberle), the government's expert on economic damages ("Eberle Report")). The government concludes that to "achieve[ ] the mandate of recovering all costs for power furnished," Def.'s Br. at 10, the court must ensure that the District does not "receive the benefit of past power usage it never paid for." *Id.* (citing Damages Tr. 224:15–22 (Eberle)).

Even if one were to put the established rates aside and consider costs and revenues on a year-by-year basis, the government concedes that during some years during the 1998 to 2007 period, the District overpaid the Bureau for the provision of energy. For example, during the 2002 season, the District received a total of 19,413,327 kWh of energy from the government at a rate of 2.59 mills/kWh and paid the government $50,281, DX 25 at 1 (Pumping Power Charges in 2002), but the government's cost of producing this energy at The Dalles Dam was less, 2.461 mills/kWh, DX 8 at 30 (Revision No. 3 to MOU), resulting in a net "overpayment" by the District for that year of $2,505. Similarly, during the 2007 season, the District used 17,795,372 kWh at a rate of 5.06 mills/kWh and paid $90,045 to the Bureau, DX 29 (Review of Opatrny Report by Dr. Eberle), but the actual cost of providing this energy for that specific year was 3.109 mills/kWh, DX 8 at 30 (Revision No. 3 to MOU), resulting in an "overpayment" by the District of $34,719.[5]

---

5. The government's year-by-year comparison for the period commencing in 1998 ignores the substantial "overpayments" on a year-by-year basis by the District to the Bureau during the earlier

years of the contract, when the rate charged by the Bureau of 1 mill/kWh always exceeded the cost to the Bureau of providing power to the District. *See* PX 12 at BPA 1054 (Mem. from

The government acknowledges that its contentions about a year-by-year basis for power charges to the District would require modifications to past practices under the Contract. As stated in the Contract, "payment of the District's charges for power supply . . . shall be made each calendar year on the basis of annual estimates by the Secretary[,] . . . [which] shall contain a statement of the estimated cost of power to be incurred for the calendar year." DX 6 at 13 (Contract § 14(b)). The estimates relate to the expected power usage by the District, see DX 17 (Notice of Pumping Power Charges from 1998 to 2007), not to the rate, which is set in cycles no more frequently than every five years. Now, based upon its new contentions, the government would provide estimates for the rate as well as the usage, with the Bureau following up with "a supplemental bill pursuant to Article 14(b)" for each of the years during which the District underpaid for its power compared to actual costs of power production. The Bureau argues that since 1990, it has refrained from taking these steps "because there was a lost revenue component that would theoretically adjust the rate to catch up so that eventually the rate charged to the District would address both the District's power usage and underpayment, which would render the need for a supplemental bill unnecessary." Def.'s Br. at 10.

■ However, the government's proposed methodology is flawed. By its actual-cost contention, the government would entirely negate the rate-setting mechanisms provided in the Contract, and, for the first time in nearly fifty years of contractual implementation (48 years, to be precise), shift to a year-by-year, actual-cost basis for charging the District for power. The court cannot accept such a remarkable nullification of certain contractual terms and a *volte face* in the interpretation and application of other contractual terms. The contractual provision for

rate-setting no more frequently than every five years must be honored, not construed to have no practical effect. And, as explained in *Dalles II*, "the post-adoption actions of parties to a contract can be useful in guiding interpretation." 82 Fed.Cl. at 356 (citing and quoting *Brooklyn Life Ins. Co. of N.Y. v. Dutcher*, 95 U.S. 269, 273, 24 L.Ed. 410 (1877), and *Chicago v. Sheldon*, 76 U.S. (9 Wall.) 50, 54, 19 L.Ed. 594 (1869)). Long-standing consistent modes of interpreting and applying contractual terms may not be blithely cast aside for litigating convenience.

■ In a closely related vein, as also elucidated in *Dalles II*, "the court applies a form of *Skidmore* deference to the Secretary [of the Interior]'s actions to determine costs of production of power and energy at The Dalles Dam." 82 Fed.Cl. at 360 (referring to *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). *Skidmore* applies where an agency's actions do not have the force of law under *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (holding that in cases where *Chevron*-style deference is inappropriate, agency interpretations may still be "entitled to respect" (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161)). The level of deference afforded to an agency's interpretation under *Skidmore* varies from "great respect" to "near indifference," depending upon "the degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228, 241, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). In all events, however, "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Bowen v.*

---

Regional Supervisor of Power to Regional Director, Pacific Northwest Region (Dec. 30, 1977), entitled "Review of Charges for Reserved Power for Irrigation Pumping") (showing actual costs of .31 mills/kWh in 1977); PX 89 at D0398 (Letter to Una Mae Harmon, Office Manager of The Dalles Irrigation District (Nov. 22, 1984)) (showing costs to the Bureau of .52 mills/kWh in 1982). This rate of 1 mill/kWh for power and energy

costs was in place for nearly thirty years, from the commencement of the Contract until 1990, see PX 31 at BPA 1040–42 (Garifo Summary), and at no time during that period did the Bureau make a year-by-year comparison of the rate charged to actual costs of producing power, nor did it provide a rebate to the District for any "overpayments."

*Georgetown Univ. Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *see also Abbott Labs. v. United States,* 573 F.3d 1327, 1333 n. 1 (Fed.Cir.2009) (same, quoting *Bowen* ).

In sum, the government's attempted recasting of the rates payable by the District to the Bureau for irrigation pumping power is rejected. The contractual terms calling for the Bureau to set rates for reserved power for the district no more frequently than every five years will be honored.

■ Alternatively, the government avers that the rate for the lost revenue component can be split into three different parts: (i) an interest component, (ii) an accounts payable component for costs not collected from the District in the previous period's rate, and (iii) a projected component for the "present value of past and future costs." Def.'s Br. at 11–12 (citing Damages Tr. 223:9–17 (Eberle)). The government cites to Dr. Eberle's testimony for its contention that the District should be awarded damages, if at all, only for the interest portion of the lost revenue component. *Id.* (citing Damages Tr. 227:20–22 (Eberle)).[6] Dr. Eberle testified that the interest portion could be separated from the backward-looking and forward-looking portions of the lost revenue component by looking to the rate calculations for those portions within the revisions to the Memorandum of Understanding between BPA and the Bureau. Damages Tr. 227:20–22 (Eberle); DX 8 at 18–36 (Revisions Nos. 1–4 to MOU). Indeed, for the revisions in 1994, 2001, and 2006, the category of "lost revenue" is separated out from the larger category of "lost revenue plus interest" for each of the previous and ensuing five-year periods. *See* DX 8 at 27, 31, 35 (Revisions Nos. 2–4 to MOU). From these charts, Dr. Eberle opined that it is possible to determine, in nominal dollars, the amount of interest included in the lost revenue component for each of those time periods. Damages Tr. 229:4–14 (Eberle). By dividing the interest amount by the long-term discount rate and performing additional calculations

based on the present-value interest rate, the precise amount paid by the irrigation district as part of the interest rate of the lost revenue component for each year from 1998 to 2007 could be determined. Damages Tr. 229:15 to 230:17 (Eberle). Through this methodology, Dr. Eberle concluded that the interest paid as part of the lost revenue component, reflecting both direct interest and discounting, comprised $80,498 of the $162,055 in lost revenue component costs assessed to the District from 1998 to 2008. Damages Tr. 230:23 to 231:6 (Eberle).

However, it is not practicable to restructure the rate for the lost revenue component in the manner suggested by Dr. Eberle for the government. In this respect, the government again attempts to change the manner by which it administers the Contract, *ex post,* to salvage some but not all of the charges that had heretofore been associated with the lost revenue component. This suggested restructuring of the lost revenue component also contravenes the Bureau's past practices in handling adjustments to the rate it was charging to the District. In adhering to Section 14(a) of the Contract, the Bureau's practice has been to set the rate no more frequently than once during every five-year period. *See* DX 8 at 18–36 (Revisions Nos. 1–4 to MOU). Furthermore, any such restructuring would contravene the parties' understanding of Section 14(b) of the Contract, under which the Bureau has been obligated to confine the scope of its annual "tune-up" of this rate to calibration for the actual amount of power used by the District. *See* DX 6 at 13–14 (Contract § 14(b)). Merely subtracting out the interest assessed on the lost revenue component and leaving in place the nominal values for the backward-looking and forward-looking aspects of that component, goes further than is permissible under Section 14(b) of the parties' Contract. Section 14(b) permits the Bureau to send an annual bill to the District based upon the prevailing established rate for power and energy plus an estimate of the power to be used, and then to adjust this billing only insofar as is

---

**6.** As stated in the briefing, this contention ignores the fact that any "present value" of past and future costs, Def.'s Br. at 12, reflects a discount rate that effectively functions as interest. However, as will be discussed, Dr. Eberle sought to make adjustments both for the direct interest portion and the implicit interest portion represented through the use of discount rates.

necessary to account for the actual power used by the District. Including a wider range of past and projected costs in these yearly adjustments, as the government purports to do in its attempt to recover "all costs, even if all costs were not covered by a particular rate," Cl. Tr. 19:10–11, implicates an adjustment that can only be done on a five-year basis pursuant to Section 14(a). Accordingly, the government's attempt to salvage some revenues by deconstructing its invalid lost revenue component into valid and invalid component parts is impermissible. The lost revenue component, as a whole, is invalid, and The Dalles is therefore entitled to recover damages based on the inclusion of the lost revenue component in the costs assessed by the government from August 18, 1998 to April 23, 2009.

### C. The District's Effort to Recoup Historical Overcharges

The Dalles seeks to recover an additional $7,341,195 in present-value dollars, or $307,589 in nominal dollars, for what it characterizes as a "surplus credit carryover" based on payments it allegedly made to the Bureau from 1962 to 1989. Pl.'s Br. at 4–5. Ms. Opatrny compiled a chart that sets forth an estimate of each year's surplus cost by subtracting an "assumed generation cost" from the actual charge assessed by the Bureau for the pertinent year. PX 99 at 1 (Lost Revenue Components Surplus Payments Carryover). From 1962 to 1982, Ms. Opatrny assumed the generation cost to the government for providing power to the District was 0.31 mills/kWh, and from 1983 to 1989, Ms. Opatrny assumed the generation cost rose to 0.52 mills/kWh. *Id.* These broad historical assumptions are derived from two pieces of evidence: (i) a memorandum by the Bureau indicating that the actual costs for generating power in the 1979 fiscal year was 0.31 mills/kWh, *see* PX 12 at BPA 1054 (Mem. to Regional Director, Pacific Northwest Region from Regional Supervisor of Power, entitled "Review of Charges for Reserved Power for Irrigation Pumping" (Dec. 30, 1977)), and (ii) a letter referring to cost data furnished by the BPA of 0.52 mills/kWh in the 1982 fiscal year. *See* PX 89 at D0398 (Letter to Ms. Harmon, Office Manager, The Dalles Irrigation District (Nov. 22, 1984));

*see also* Damages Tr. 84:9–16 (Opatrny) (noting that only two data points were used to determine costs from 1962 to 1989). Given that the District was assessed a flat rate of 1 mill/kWh for power and energy costs from 1962 through 1989, *see* PX 31 at BPA 1040–42 (Garifo Summary), Ms. Opatrny calculated that the estimated surplus charged over cost from 1962 to 1982 was 0.69 mills/kWh, and that the estimated surplus charged over cost from 1983 to 1989 was 0.48 mills/kWh. PX 99 at 1 (Opatrny Report, Lost Revenue Components Surplus Payments Carryover); *see* Damages Tr. 87:1–3 (Opatrny).

In the first years of contractual implementation, the framework for the Bureau's rate establishes that there was a degree of historical overcharge by the Bureau to the District. *See supra*, at 605–07. The rate charged by the Bureau stayed at 1 mill/kWh for twenty-seven years, but the cost of supplying power during this time period was less than 1 mill/kWh, as indicated by the historical data points and Ms. Opatrny's analysis concerning the 1977 and 1982 fiscal years. Yet this court has already ruled that the statute of limitations contained in 28 U.S.C. § 2501 forecloses the District from bringing any claim for damages incurred more than six years prior to August 18, 2004, the date of the initial filing of the complaint in this case. *See Dalles I*, 71 Fed.Cl. at 354 ("[T]he statute of limitations is not tolled for those claims that occurred prior to August 18, 1998 and, thus, this court does not have subject matter jurisdiction over such claims."). The District acknowledges this ruling but contends that the statute-of-limitations bar does not apply to recoupment of those surplus payments because the District is "not looking to stretch back into 1962 to determine a claim at that time, [it is] looking to this year, to see what credits should have been available." Cl. Tr. 9:15–18. Under the District's interpretation, the Bureau renews its breach of its obligation to grant surplus credits to the District each year that it fails to provide such credits. Pl.'s Post–Trial Damages Reply Brief at 11 ("Pl.'s Reply"). This interpretation, however, misapprehends the date of accrual, which occurs " 'when all the events have occurred which fix the liabili-

ty of the [g]overnment and entitle the claimant to institute an action.'" *Brown Park Estates–Fairfield Dev. Co. v. United States,* 127 F.3d 1449, 1455 (Fed.Cir.1997) (quoting *Brighton Vill. Assocs. v. United States,* 52 F.3d 1056, 1060 (Fed.Cir.1995)). In this instance, any such accrual would have occurred the first time that the Bureau failed to grant a surplus credit allegedly due to the District. The District's arguments to the contrary are unavailing.

■ Undeterred, the District cites a recent Supreme Court ruling, *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006), for the proposition that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." 546 U.S. at 516, 126 S.Ct. 1235. However, the jurisdictional character of 28 U.S.C. § 2501 recently was confirmed by the Supreme Court in a post-*Arbaugh* decision, *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 128 S.Ct. 750, 753–56, 169 L.Ed.2d 591 (2008) (holding that the limitations bar of Section 2501 constrains this court's jurisdiction and is not amenable to forfeiture or waiver).

Accordingly, because the District's claim for historical overcharge encompasses a time period prior to August 18, 1998, the District is barred by the applicable statute of limitations from recovering damages based on any historical discrepancies between the 1 mill/kWh rate charged the District by the Bureau from 1961 through 1989 and the actual costs to the Bureau of providing power and energy to the District during that time period.

### D. Depreciation

■ As it did during the trial on liability, the District again argues that it has been improperly charged for depreciation costs associated with facilities at The Dalles Dam. The District contends that it has been charged 0.59 mills/kWh for "Investment Repayment," but that the actual cost for "operation, maintenance, and replacement" was only 0.31 mills/kWh, meaning that 0.28 mills/kWh should be backed out of its "Investment Repayment" charge as either duplicative of the "replacement" charge already assessed

or unnecessary in order for the Bureau to recover its actual costs. Pl.'s Br. at 6–8.

However, as was established in the opinion on liability, the depreciation charged to the District is derived from capital costs associated with power generation at The Dalles Dam. *Dalles II,* 82 Fed.Cl. at 364. These depreciation costs relate to the original capital investment at the dam and subsequent improvements, and consequently fall within the range of "all costs" of power and energy associated with the dam, reservoir, and power plant that the District is contractually obligated to pay. *Id.* Depreciation costs thus cannot be "backed out" of the payments made by the District, and the District's renewed claim to that effect is unavailing.

### E. Interest

■ The District contends that its damages should be measured by assessing compound interest, calculated through 2009, on the original nominal-dollar amounts of its damages, to attain the "present value" of the damages to which it is entitled. *See* Pl.'s Br. at 9–11. However, it is a well-established rule that "[a]part from constitutional requirements, in the absence of specific provision by contract or statute, or 'express consent … by Congress,' interest does not run on a claim against the United States." *United States v. Louisiana,* 446 U.S. 253, 264–65, 100 S.Ct. 1618, 64 L.Ed.2d 196 (1980) (quoting *Smyth v. United States,* 302 U.S. 329, 353, 58 S.Ct. 248, 82 L.Ed. 294 (1937)). For this court, this rule is codified in the United States Code, which in pertinent part provides that "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516(a); *see Library of Congress v. Shaw,* 478 U.S. 310, 317, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (recognizing that the Supreme Court "repeatedly has made clear that [28 U.S.C. § 2516(a)] merely codifies the traditional legal rule regarding the immunity of the United States from interest"), *superseded on other grounds by statute,* Civil Rights Act of 1994, Pub.L. No. 102–166, 105 Stat. 1071. Here, the award for damages has not been made pursuant to a constitutional provision

**614**

requiring interest, such as the Takings Clause, U.S. Const. amend. V, nor has it been made under a statute that provides for interest, such as the Contract Disputes Act. *See* 41 U.S.C. § 611. In addition, no such provision has been included in the contract itself. Therefore, interest has not been included in the award.

## CONCLUSION

For the reasons set forth, the court finds that plaintiff is entitled to damages as a result of the inclusion of the lost revenue component in the rates for power assessed by the Bureau from August 18, 1998 to April 23, 2009. The Dalles is awarded damages in the amount of $172,954.[7] No interest is awarded. The clerk shall enter final judgment in favor of The Dalles for this specified amount. The Dalles is also awarded its costs of suit.[8]

It is so ORDERED.

---

7. This amount is calculated by taking the agreed-upon damages of $162,055 from August 18, 1998 through December 2008, *see* PX 98 at 4 (Opatrny Report), and adding to that amount an additional sum of $10,899, to account for damages incurred to April 23, 2009 on a per-diem basis of $96.45 (an identical rate to that which was used to measure damages incurred in 2008).

A discrepancy exists in Ms. Opatrny's report regarding the amount paid by the District relative to the lost revenue component in its rate from August 18, 1998 through the end date of her calculation. At one point in her report, Ms. Opatrny stated that her calculation ran "from August 18, 1998 through 2008." PX 98 at 4

(Opatrny Report). In a table on the same page of her report, however, she used a heading of "August 18, 1998–March 2009." *Id.* Ms. Opatrny's testimony at trial did not explicitly resolve this discrepancy, but the court understood her testimony to indicate that her calculations to run through 2008. In its post-trial brief, the government states the same understanding. *See* Def.'s Br. at 9–10.

Additionally, this remedy at law is sufficient to redress the breach by the Bureau of its Contract with the District. As a result, the District is not granted any equitable relief.

8. The motion to correct trial transcript, filed June 22, 2009 by The Dalles, is GRANTED.